**UNITED STATES of America, Plaintiff,**

v.

**LOCAL 560 (I.B.T.), Nominal Defendant–Intervenor,**

**and**

**Michael Sciarra, Defendant.**

**Civ. A. No. 82–689.**

United States District Court, D. New Jersey.

May 4, 1990.

Samuel A. Alito, Jr., U.S. Atty. by Robert C. Stewart and Colette R. Buchanan, Asst. U.S. Attys., Newark, N.J., for the U.S.

Michael Critchley, West Orange, N.J., for nominal defendant-intervenor Local 560 (I.B.T.).

Weissbard & Wiewiorka, Harvey Weissbard, West Orange, N.J., for defendant Michael Sciarra.

## OPINION

DEBEVOISE, District Judge.

The government, the plaintiff in this case, moves for an order preliminarily enjoining defendant, Michael Sciarra, from holding any position of trust within Teamsters Local 560. An evidentiary hearing was held at which defendant and Local 560 opposed the application. This constitutes my findings of fact and conclusions of law.

### A. The Background

On March 9, 1982 the government filed the complaint in this action pursuant to 18 U.S.C. § 1964 (the Racketeering Influenced and Corrupt Organization Act ("RICO")). Asserting that Local 560 was being victimized by racketeering activity, the complaint sought injunctive relief against certain persons referred to as associates of the Provenzano Group and against the then Local 560 Executive Board incumbents, who included among them Michael Sciarra. The action was tried before the Honorable Harold A. Ackerman who, on February 8, 1984, after lengthy hearings issued an opin-

ion, *United States v. Local 560, Intern. Bro. of Teamsters,* 581 F.Supp. 279 (D.N.J. 1984), *aff'd,* 780 F.2d 267 (3d Cir.1985). Judge Ackerman concluded that the Provenzano Group, through racketeering activity, had dominated and exploited Local 560 for more than a quarter of a century. A summary of his findings is set forth in my earlier opinion in this case, *U.S. v. Local 560 (I.B.T.),* 694 F.Supp. 1158, 1161–65 (D.N.J.1988), *aff'd,* 865 F.2d 253 (3d Cir. 1988).

The Provenzano Group was a part of the New York organized crime entity known as the Genovese Family. The Provenzano Group, it was found, established total control over Local 560 and by force and intimidation extinguished the rights of the Local's members to democratic control of their union, its policies, officers and funds. Judge Ackerman further found that Local 560's Executive Board aided and abetted the Provenzano Group in these endeavors. In RICO terms the Executive Board members violated RICO's § 1962(b) and conspired to violate § 1962(b) in contravention of § 1962(d).

Michael Sciarra was a member of the Executive Board and thus was found to have engaged in the RICO violations. Judge Ackerman concluded that in order to restore union democracy the Executive Board had to be removed and the aura of fear and intimidation eliminated. To accomplish this the March 16, 1984 Judgment Order removed the entire Executive Board and imposed a trusteeship. The March 16, 1984 order was stayed pending resolution of an appeal to the Court of Appeals and of a petition for certiorari to the Supreme Court. On June 23, 1986, all appeals from the March 16 order having been concluded, Judge Ackerman appointed Joel Jacobson Trustee of Local 560. On May 12, 1987 Judge Ackerman appointed Edwin H. Stier, Esq., in place of Jacobson. Stier's efforts were directed towards developing conditions within Local 560 which would permit free and unfettered control by its membership and the elimination of all organized crime influence and control. His efforts in this regard are summarized in my former opinion, 694 F.Supp. at 1184–85. In 1988 he concluded that it was possible to conduct an uncoerced election for officers and an Executive Board, and, pursuant to an order of Judge Ackerman, an election for those positions was scheduled for November 1988.

A powerful group within the union, Teamsters for Liberty, had long dedicated itself to termination of the trusteeship. Its candidates for President and Vice President were two former Executive Board members, Michael Sciarra and Joseph Sheridan. They, of course, were among those found by Judge Ackerman to have aided and abetted the Provenzano Group.

The government then sought in proceedings before me to enjoin Sciarra and Sheridan from running in the election. It contended that permitting them to resume office would turn Local 560 over to renewed risk of control by the Genovese Family, undoing all the efforts expended to free the union from the grip of organized crime.

Hearings were held on the government's application. I concluded that the government's evidence demonstrated that it would likely prevail on its charge that during the period when Judge Ackerman's order was stayed, Sciarra and Sheridan, particularly Sciarra, had been a part of a continuing effort by the Genovese Family to retain control of Local 560 both during and after ultimate termination of the trusteeship. Taped conversations of leaders of the Genovese Family and of Local 560 leaders led me to conclude:

> The tapes constitute strong evidence that the Genovese Crime Family intended to maintain its control over Local 560 during the pendency of the appeal from Judge Ackerman's March 16, 1984 Judgment Order, during any period of trusteeship, and thereafter. The tapes constitute strong evidence that this control was to be exercised through Anthony Salerno's caporegime Matthew Ianniello and that Ianniello, upon the advice of Stephen Andretta, selected Michael Sciarra to be the man on the scene at Local 560 to whom orders and instructions could be given.

694 F.Supp. at 1178.

I also found that the evidence concerning the manner in which Sciarra, who had be-

come President, and the other Executive Board members conducted the union's affairs during the period of the stay "must be viewed as corroborative of Sciarra's and Sheridan's continued participation in the Genovese Family conspiracy to maintain control of Local 560 in violation of RICO." 694 F.Supp. at 1184. The evidence concerning the taped conversations and the manner in which the union's affairs were conducted is summarized at 694 F.Supp. at 1169–84.

I concluded that if Sciarra and Sheridan were to become President and Vice President of Local 560, there would be a very real danger that all the efforts expended during the trusteeship to free the union from racketeer control would be undone and the union would again become the creature of the Genovese Family. As I stated then:

> The consequences of such a development would extend far beyond the membership of Local 560. The public at large is hurt by racketeer domination of a union. Ultimately the public pays a heavy price for labor extortion, sweetheart contracts, the looting of pension funds.

> .    .    .    .    .

> The public's interest in a racketeer free Local 560 overrides the interests of its members, even a large majority of the members, to elect officers who in all likelihood will lead Local 560 back into the control of the Genovese Crime Family. The government is highly likely to establish at a final hearing that the election of Sciarra and Sheridan as President and Vice President will have that very effect.

694 F.Supp. at 1192.

Based on my findings I entered an order preliminarily enjoining Sciarra and Sheridan from running for office in the election scheduled for November 1988. Thereupon the Teamsters for Liberty nominated Michael Sciarra's brother Daniel Sciarra for President and Joseph Sheridan's nephew Mark Sheridan for Vice President. In a December 6, 1988 election which was carefully monitored and fairly conducted the Teamsters for Liberty slate won. As a result Daniel Sciarra and Mark Sheridan assumed the offices for which they ran. The other persons elected to the Executive Board were Robert Marra, who became secretary-treasurer, Peter Granello, James Bartolomeo, Al Vallee and Nunzio Spanno. Stier, the Trustee, turned over the day-to-day administration of Local 560 to the newly elected officers and Executive Board but continued to serve in a monitoring role.

On January 12, 1989 the newly elected Executive Board appointed both Michael Sciarra and Joseph Sheridan to the position of business agent. The government obtained an order requiring Sciarra and Sheridan to show cause why they should not be immediately barred from holding any appointed position within Local 560 pending outcome of the trial of this matter. The government urged that Sciarra and Sheridan gave the appearance of acting as de facto officers of the Local and of exercising actual power consistent with that of an incumbent Executive Board member, thus creating the risk of re-emergence of Genovese Family control of the union.

At the hearing on January 25, 1989 I concluded that, troubling as this development might be, I could not assume without more that the new officers and Executive Board would not assume full control of the union or that they would be subject to Michael Sciarra's domination and influence. Consequently I denied the government's application at that time. I admonished the new officers and Executive Board members that they had placed themselves in a difficult position and that they must recognize past history and not permit themselves to become the tools of Sciarra and Sheridan.

Events proceeded. The Trustee, pursuant to orders of Judge Ackerman, continued to monitor closely the management of the union. The new officers and Executive Board members entered upon their duties. More recently Joseph Sheridan entered into a settlement with the government, resigning as business agent and agreeing not to involve himself in the future in the management of Local 560. Michael Sciarra, however, remained highly involved in the union's affairs.

On February 6, 1990 the government moved once again to bar Michael Sciarra from holding any position of trust in the union. The evidence clearly establishes that the government is likely to prove at the final hearing that the officers and Executive Board members are relatively new and inexperienced, and that Michael Sciarra has used his personal hold on a large following in the union and his position as business agent to exert power and influence over the affairs of Local 560, far beyond that of the ordinary business agent. There is every reason to believe that in the minds of the officers and Executive Board members and in the minds of the membership at large he is the de facto President of Local 560. Further, Michael Sciarra has been prevented from gaining appointment to a trusteeship on the union's benefit plans only because of the presence of the court-appointed Trustee. It is evident that through his strong personality and his hold on a large segment of the Local 560 membership Michael Sciarra will use any position he may have in Local 560 to assert de facto control, thus creating all the risks which the preliminary injunction in this matter was designed to avoid.

### B. The New Evidence

1. *Local 560's New Leaders:* Michael Sciarra's and Local 560's own evidence establishes the relative weakness and inexperience of the new officers and Executive Board members.

It would have been an extraordinary coincidence if, after Michael Sciarra and Joseph Sheridan were enjoined from running for President and Vice President, the next two most qualified men would have been the brother of one and the nephew of the other. When Daniel Sciarra and Mark Sheridan were selected to head the Teamsters for Liberty slate it must have occurred to some that the choice was motivated at least in part by a desire to empower indirectly the two men who had been enjoined from running for those offices. The post-election appointment of Michael Sciarra and Joseph Sheridan as business agents only heightened the concern that they were seeking to do indirectly what they had been enjoined from doing directly.

I have no doubt that Daniel Sciarra is an able and honorable person. However, prior to his election he had held no union elective position. I do not believe that the record reflects that he had even served as shop steward, much less as business agent. The tapes of the four membership meetings over which he presided, even the tape of the January 25, 1990 meeting where his ebullient brother Michael had been persuaded (almost successfully) not to talk, demonstrate that his leadership is low-key and that he lacks his brother's charisma.

Mark Sheridan, the new Vice President, is relatively young and also had held no elective position. Nothing in the record demonstrates that he has assumed a strong leadership role since assuming office.

Of the remaining newly elected Executive Board members Peter Granello is the most experienced, having held office and having served as a business agent in the past. The new secretary-treasurer Robert Marra, had served as a shop steward and for the eleven months preceding the December 1988 election had held the post of business agent. The other Executive Board members, James Bartolomeo, Al Vallee and Nunzio Spanno had never been business agents although one or more of them had served as shop steward.

2. *The Union and the Funds:* Thus on December 8, 1988 a relatively inexperienced team became responsible for administering a local union which had approximately 7500 members, 400 collective bargaining agreements to negotiate and enforce and four employee benefit plans.

The membership is diverse. Its basic component consists of truck drivers. But other trades which have been organized by Local 560 include warehousemen, manufacturing workers and construction workers.

A National Master Freight Agreement covers employees in the trucking industry, and therefore there is a large degree of uniformity in the contracts which have to be negotiated with trucking employers. However, local riders are often negotiated to deal with conditions peculiar to individu-

al employers. There is a wide range of diversity in the so-called "house" or "miscellaneous" contracts which must be negotiated with employers in non-trucking fields. The Executive Board members and the eight or nine business agents who are not members of the Executive Board are responsible for negotiating the approximately 400 collective bargaining agreements. The few newly elected Executive Board members who had had previous experience with negotiating contracts had been "in freight" and were unfamiliar with house contracts.

The employee benefit plans are matters of major importance to the membership. They consist principally of the Trucking Employees of North Jersey Welfare and Pension Fund (TENJ) and the Teamsters Industrial Employees Pension and Welfare Fund (TIE).

The TIE fund came under Local 560's jurisdiction when in 1983 or 1984 Local 84 and Local 560 merged. Local 84 included basically manufacturing, warehousemen and miscellaneous groups of employees. At the outset the TENJ fund covered workers in the trucking industry but was later expanded to include construction and some other industries.

For a time the TIE fund was managed by two employer and two employee trustees. Recently the number of trustees has been increased to three of each category. The much larger TENJ fund has at all pertinent times been managed by three employer and three employee trustees.

These funds established for the benefit of Local 560's members have accumulated very substantial assets. As described in Judge Ackerman's 1984 opinion these funds were a prime target of the Provenzano Group during its period of control, and the funds suffered from the racketeering activity of the Provenzano Group. One of the prime objects of the underlying lawsuit was to protect the interests of the membership in the funds.

The court-appointed Local 560 trustee assumed the employee trustee positions on the funds. On May 12, 1987 Edwin H. Stier replaced the original court-appointed trustee of Local 560 and consequently became TENJ's and TIE's employee trustee. During the period of the trusteeship significant changes were made in the administration of the funds.

The position of controller was created and the audit function was reorganized. Several functions, such as computer services, which had been contracted out were brought in-house to avoid what was considered excessive charges. The investment manager's fees were deemed excessive and investment functions were turned over to the Melon Bank and the Wells Fargo Bank. The funds' actuary was replaced with a nationally recognized actuarial firm.

At about the time of the December 1988 election the funds were confronted with the necessity of either cutting benefits significantly or raising contributions to the funds. This resulted from several factors. The actuary who had been replaced appeared to have miscalculated the amount of payments required to provide the level of benefits promised. Medical costs and medical insurance premiums had risen dramatically. Local 560's witnesses testified in these proceedings that Stier's predecessor trustee had negotiated contracts which devoted an excessive portion of employers' increased payments to worker take-home pay rather than to contributions to the funds. This had the effect of making the new contracts seem more attractive to the workers, but it also had the effect of presenting future administrators of Local 560 with the problem of making up the deficiencies in contributions.

The problem was disclosed to Local 560's membership the day after the election of the new officers and Executive Board. The newly elected officials, understandably, did not wish to be blamed for the situation, which evoked heated reactions among the membership but for which they bore no responsibility.

Nevertheless, while negotiating contracts the Executive Board members and the union's business agents had to take up this problem with the funds' managers. As a rule employers had a certain dollar amount which they could offer by way of increases.

That amount could be applied to take-home pay or to contributions to benefit plans. The employers were not particularly concerned where the money was applied, but union negotiators sought to apply as much as possible to the employees' paychecks. In the circumstances which prevailed in late 1988 and to the present time the fund administrators had no choice but to inform the business agents that the major part of the employers' increased payments would have to go to the funds in order to avoid or limit benefit reductions. Thus during the contract negotiation process the business agents in effect had to bargain with the fund administrators to try to find ways to structure a palatable collective bargaining agreement.

*3. Michael Sciarra's Role:* The foregoing should suggest some of the complexities facing the newly elected officers and Executive Board members when they took over responsibility for Local 560 and its funds on December 8, 1988. Judge Ackerman recognized that a period of transition would be needed before the newly elected officials could assume full responsibility for the Local and its funds. Therefore the trustee was retained in a monitoring role, the purpose of which was to ensure that the union did not fall back into its pre-trustee posture and to effect a transition which would permit termination of the trusteeship.

As recited above, in 1988, prior to the December election, I concluded that if Michael Sciarra were to become President of Local 560 there would be a very real danger that all the efforts expended during the trusteeship to free the union from racketeer control would be undone and the union would again become the creature of the Genovese organized crime family. That was the reason I preliminarily enjoined him from running for the office of President.

Even the limited evidence introduced at the hearing on the government's present application demonstrates that by reason of the inexperience and subservience of the present officers and Executive Board members and the insatiable desire of Michael Sciarra to be in command of Local 560, Michael Sciarra is de facto President. At the outset of their incumbency the officers and Board members turned to him for advice and assistance in all critical areas of the union's activities. Under normal circumstances he would have been a natural person to turn to because of his intimate knowledge of the industry, the contracts and funds. But in the circumstances which prevail here, by turning to Michael Sciarra the officers and trustees invited the fox into the hen roost, and not surprisingly the fox devoured the hens. I shall review the evidence.

*a. Sciarra's Role in Administering the Union:* I trust I made it very clear at the time of the January 1989 hearing on the government's application to enjoin Michael Sciarra from serving as business agent that the new officers and Board members had a weighty responsibility to ensure that he did no more than serve in that role and that he not assume the responsibility of an officer or Board member. In the light of hindsight I now recognize that I expected the impossible.

It is true, the Board, in response to my concerns, placed restrictions on Michael Sciarra. He was forbidden to go to any work site alone; he had to be accompanied by another business agent. He was required to call into the Local 560 office to report twice a day and he maintained a calendar for each day. At the Local 560 headquarters he shares an office with Peter Granello and Mark Sheridan. These restrictions, Local 560 maintains, are ones imposed on no other business agent in the United States. I conclude, however, that they are cosmetic only and have no effect whatsoever in moderating the actual role which Michael Sciarra plays.

There are two principal areas of concern—the administration of Local 560 itself and the administration of the funds. Michael Sciarra has achieved substantial administrative control; he has vigorously sought to place himself in a position to dominate the funds.

Several episodes which occurred at Local 560's offices and the tapes of four general membership meetings confirm Michael Sci-

arra's role in the administration of the Local.

I will refer to certain of the episodes in the course of my discussion of the funds. One episode was described by Thomas G. Hynes, a special agent with the United States Department of Labor. On November 1, 1989 he met with the executive director of the funds, Michael Santonello, and with the controller, Glenn Simpson. The meeting was in Santonello's private office in the Local 560 building. Without knocking, Michael Sciarra, with Mark Sheridan in tow, came into the room. Ignoring Hynes and Simpson for five minutes he engaged in conversation with Santonello concerning a particular contract under negotiation. At the conclusion of the conversation Sciarra asked for the date of the next fund board meeting and stated he wanted to be there.

Sciarra and Sheridan left the room. Shortly afterwards as Hynes waited at the elevator to leave Sciarra came up to him, asked who he was and asked particularly if he were with the government. Sciarra gently pushed Hynes in the chest stating "Get out of here." Hynes testified, "I got the message he wanted me out of the building."

The Local 560 general membership meetings of January 18, 1989, April 20, 1989, September 24, 1989 and January 25, 1990 were videotaped. The tapes are in the record and I have viewed each of them. Michael Sciarra's dominant role in the union is unmistakably displayed.

At the January 18, 1989 meeting routine matters were taken care of—the salute to the flag, the secretary's report, the treasurer's report. Daniel Sciarra presided, but Michael Sciarra was the obvious object of the attention of both the Board members and the members themselves. Michael Sciarra made an initial speech, he repeatedly answered questions which members raised from the floor. Members rose to pay tributes to him and to ask why he couldn't hold a democratically elected office. Sciarra responded with a freewheeling attack on the court imposed restrictions asking rhetorically "When the hell are they going to stop punishing me?" Apparently realizing that

he might be weakening the posture of subservience which he was supposed to maintain, he stated that he had to stop—"Joey's getting nervous." Upon the adjournment of the meeting Sciarra was the object of an outpouring of members' affection as they milled about him and exchanged embraces.

At the April 20, 1989 meeting Michael Sciarra was positioned strategically on the platform. After the opening formalities each officer and business agent gave a brief report. Several praised Michael Sciarra for his assistance to them. Daniel Sciarra presided but his manner is mild and perhaps because of innate modesty he does not take credit for any of the union's accomplishments. Business agent Joseph Sheridan graciously complimented Daniel Sciarra and Mark Sheridan for the good work they were doing.

Business agent Michael Sciarra was the last to give a report, and from that point on he virtually took over the meeting. When he first stepped to the microphone he was greeted by a standing ovation of the full membership. The officers and Executive Board members on the platform enthusiastically joined in.

Michael Sciarra proceeded to introduce a representative of Eastern Airlines strikers and directed the taking of a collection to assist the strikers. In a rapid-fire, very lengthy speech Michael Sciarra attacked the court-appointed trustee, reviewed the status of contract negotiations, described how he was telling Daniel Sciarra and the other officers and business agents how to proceed. But he was careful to note "I'm proud I'm working for these guys." He stated that if people thought he was the boss they were, in effect, crazy.

Another standing ovation followed the Sciarra speech. Momentarily he left the podium. However when a motion was made concerning payment of legal fees he pushed brother Daniel aside and took over the meeting, speaking in defense of the motion, recognizing a second, calling on persons to speak and taking the vote. That done he turned the chair over to Daniel. But repeatedly thereafter he came forward to answer questions or to preside over the

meeting for a spell. There could be no question who was in control—Michael Sciarra.

The situation was even more dramatically portrayed at the September 24, 1989 meeting. The government compared the meeting to a Nuremberg Rally. That description is not apt. There were present none of the dark, degenerate forces of the Nazi movement. Rather the meeting put one in mind of a joyful and adoring populace celebrating the coronation of its royal potentate.

Michael Sciarra was seated on the platform next to President Daniel Sciarra. At the outset representatives of the United Mine Workers sought assistance in connection with the Pittston strike. Treasurer Robert Marra sought and obtained approval of an increase in initiation fees. After that the coronation ceremonies began.

Al Vallee's reading of the minutes of the last meeting concluded with thanks to Mike Sciarra, a great asset to the Local.

Marra's financial report was concluded with expressions of appreciation for the advice and assistance which Mike Sciarra provided. Referring to Sciarra's leadership of the union, Marra invoked the Deity—"God Bless Mike Sciarra."

Each business agent was called upon in turn to report. Apparently not one of the twelve reporting persons had been able to do anything on behalf of the union without the advice and assistance of Michael Sciarra. Each in turn sought to outdo his predecessors in extolling the virtues of their co-business agent. As the paeans of praise rolled forth one business agent extolled Sciarra as "not only an expert but a genius." Another referred to him as "My friend, my father, my brother—your friend, your father, your brother." One Executive Board member resorted to poetry: "The work is hard, the pay is small, but working for the Sciarras is best of all", embracing Michael Sciarra upon completion of the rendition.

Upon the conclusion of these twelve or thirteen "reports" Michael Sciarra presented himself to his people, evoking the usual standing ovation.

Anticipating the reaction that some might have to these goings-on Sciarra shouted: "I'm assisting these guys. I'm not the boss—he's the boss (indicating Daniel Sciarra). I assist; I help; I'm not the boss." Some might think Michael Sciarra doth protest too much.

There ensued a lengthy and earthy speech covering a truckers' licensing bill, problems with certain contracts, pension and welfare plan lost benefits. Mention was made of the Provenzanos, about whom Sciarra stated, "I loved them—they're dead."

After the Sciarra oration Joseph Sheridan announced his departure from Local 560. It was a brief, affectionate and warmhearted parting. It concluded with a parting wish—that Michael Sciarra get what he deserves, that he be President of Local 560 someday.

Treasurer Robert Marra discussed problems of the pension and welfare funds, stating that the only way to cure them was to have Michael Sciarra chair them.

Daniel Sciarra briefly resumed the chair for new business. However Michael Sciarra was called back to explain the effect of a member's motion on the actions of the pension fund trustees. He then took over the meeting for further questions and in the process of giving additional remarks asked the rhetorical questions when would the punishment stop, why was he not allowed to be president.

On October 13, 1989 between the September 20, 1989 meeting and the next meeting which took place on January 25, 1990, Judge Ackerman held a hearing to determine the extent to which the objectives of the trusteeship had been realized during the incumbency of the new officers and Board members. He had to determine whether the time had come to modify or terminate the trusteeship. Among the matters brought to Judge Ackerman's attention was the government's concern that Michael Sciarra was assuming a dominant role in Local 560. At the conclusion of the hearing Judge Ackerman requested that the Trustee submit a supplemental report.

On January 9, 1990 Judge Ackerman issued a letter opinion and order. He concluded that much had been accomplished to put in place a workable, democratic trade union at Local 560. He expressed concern that there had been only two issues of the Local's newspaper since the Executive Board took over. He expressed concern about the role of Michael Sciarra. On that subject the opinion stated:

Second, and more important, the Government has put forth evidence that despite the Executive Board's stated efforts to limit Michael Sciarra's role in Local affairs, he has steadily grown more dominant in the Local's business. If the Government's view of the facts is correct, then further progress toward a democratic Local, free of corruption, will be impeded. At this point, I want to make it clear to all of the interested parties that I make no finding on this issue. Michael Sciarra's role in the Local is a question that must be put before my colleague Judge Debevoise, not before me. Therefore, I shall allow the Government 90 days from the filing of this letter opinion and order to proceed before Judge Debevoise. If the Government does not proceed, then I will assess the progress of the Trusteeship at the end of this time period. If the Government does proceed before Judge Debevoise within this time period, then I shall await the outcome of that proceeding before assessing the progress of the Trusteeship.

The January 25, 1990 meeting of the Local 560 membership was held shortly after issuance of the opinion. The tone of the meeting was in marked contrast to that of its three predecessors. It was relatively brief; it was almost subdued.

There were the usual secretary's and treasurer's reports. Robert Marra did avail himself of the opportunity to express his thanks to Michael Sciarra for tipping him off on a matter that enabled him to effect a recovery by the union from the Welfare Fund. He read to the membership Judge Ackerman's January 9 letter opinion. He reminded his audience that Michael Sciarra was there when help was needed, that he was subjected to many restrictions and that he was "Going through hell and God Bless him."

Daniel Sciarra made a rare, perhaps his only speech to the members. He stated that Michael Sciarra was not the boss, that the members of the union were the boss. He stated that if anyone showed him that Michael Sciarra had intimidated anyone he would fire Michael.

The video camera was applied somewhat differently at the January 25 meeting. It focused on the person in the chair and on the persons on the podium to the left of the presiding officer. It switched to speakers on the floor, but it never covered the persons to the presiding officer's right, where Michael Sciarra usually sat. Viewing the video, I was unable to ascertain whether Michael Sciarra was present.

There were no business agent reports that night. New business meandered a bit, as Daniel Sciarra engaged in frequent consultations with the Local's attorney, Paul Montalbano, Esq., who was in his usual position immediately to the left of the chair. The attorney reported on conditions created by the bankruptcy of Arrow Trucking. Members raised problems related to double tractor practices, medical benefits and drug testing requirements. There was confusion concerning the latter problem and Michael Sciarra suddenly appeared from Daniel Sciarra's right and set the matter straight.

Shortly thereafter a member shouted to Sciarra from the floor, "We want to hear from you once in awhile." Evidently Sciarra's reticence to that point had left an unaccustomed void. Sciarra provided the explanation: "I was told I couldn't talk." I have no doubt that Judge Ackerman's January 9, 1990 letter opinion had produced this silence. I find, however, that the true role which Michael Sciarra plays in Local 560 is disclosed in the videos of the first three meetings. Members of the union's Executive Board have complained in this case that they have been damned if they do and damned if they don't; that here they are damned if Sciarra speaks and damned

if he doesn't speak. The answer to that complaint is that often what is significant is when you do and when you don't.

Local 560 Newsletters have been introduced into evidence. They devote an unusual amount of attention to Michael Sciarra in contrast to the attention given to other business agents and to the officers and Executive Board members. In isolation this would not be dispositive of Michael Sciarra's true role in Local 560. It is corroborative of other evidence showing both his perceived and his actual role in the union.

*b. Sciarra's Attempts to Become a Fund Trustee:* One of the key purposes of the trusteeship was to protect the benefit funds and to prevent them from once again becoming a target of racketeering exploitation. To that end it was particularly important that persons formerly associated with the Provenzano Group not be placed in a position of responsibility with respect to the funds.

Two disturbing fund-related developments emerge from the evidence. The first is Michael Sciarra's continued efforts to become a trustee of the funds. The second is the Executive Board members' seeming inability to understand the inappropriateness of such an appointment and their continuing efforts to further Sciarra's goal of becoming a fund trustee.

I have previously described the steps which Trustee Stier took to place the funds in a sound administrative and financial posture. During the period of the trusteeship he had assumed the position of employee trustee, but after the December 1988 election of the officers and Executive Board his objective became to fill the two vacant employee positions with Local 560 members. While the trusteeship continued he planned to retain the third employee position himself.

As part of this transition Stier organized seminars for the new officers and Board members. The seminars were designed to provide basic information about the funds and about the responsibilities of fund trustees. Stier arranged for Daniel Sciarra to sit in on fund trustee meetings so that he would learn of the current problems and issues which the funds faced.

In February 1989 Stier asked Daniel Sciarra if he would accept an appointment to fill the first employee vacancy. Sciarra asked that Stier hold off on the appointment and Stier asked him to let him know when he was ready.

Thereafter at fund seminars held in February various Executive Board members suggested to Stier that he appoint Michael Sciarra to the employee position on the fund. In personal conversations Daniel Sciarra echoed this suggestion. Responding to these requests Stier referred to the remarks I made in January at the time I rejected the government's application to prevent Sciarra's appointment as business agent. Stier interpreted those remarks (quite rightly) as precluding Michael Sciarra's appointment as a fund trustee. Stier informed Michael Sciarra as well as Daniel Sciarra of his views in this regard.

Nevertheless, at the March 27, 1989 meeting of Local 560's Executive Board Daniel Sciarra raised the question of his brother's appointment as a fund trustee. He suggested not only that Michael Sciarra be appointed as a trustee but that somehow he should be in charge of the funds as chairman or in some other key leadership role. The Executive Board members concurred in the idea. Stier, who attended Executive Board meetings, laid out his position in a manner which could not be misunderstood. He testified:

> I told him that in my view—that I was not going to do it, that I thought it was wrong, that I couldn't do it and I wouldn't do it.
>
> .       .       .       .       .
>
> I told him that in my view, having Michael Sciarra play that kind of a role with respect to the pension and welfare funds would violate the restrictions imposed on him by Judge Debevoise and that I was not going to do it.
>
> .       .       .       .       .
>
> I told him that Judge Debevoise had imposed that restriction, as I understood it, from having read the Court's opinion,

because he determined that Michael Sciarra had organized crime connections that were dangerous to the union and that he was going to continue to impose restrictions on him for some period of time because of the vulnerability of the union to racketeer influence.

I said, "Look, Danny, I know it is your brother, and I know it is difficult for you to understand and accept that, but I'm telling you as clearly as I can what the basis for that decision is."

Transcript at 44, 45.

The entire Executive Board heard those remarks.

At the same meeting Stier tried to impress upon the officers and Board members the importance of their truly running the union and their not permitting Michael Sciarra to exercise control or to appear to the membership to be exercising control:

I told them that it was important, not simply to restrict Michael Sciarra within the confines of the executive board, that is, to limit it to what went on in the union hall, but it was also important to create the right perceptions among the Local 560 members.

What this trusteeship was about, it seemed to me, was creating a spirit of democracy within the union, and that means the membership would have to understand that the people that they elected to office are the ones who are going to serve in those positions and they believe that the election is what is going to control who has what responsibility to run the union.

To the extent that they believe that somebody who was not elected to office, however popular he may be, is the guy who really holds the power, that was contrary to what we were trying to achieve.

The executive board had to deal with perceptions that they and Michael Sciarra were creating about who was in charge.

Transcript at 47, 48.

Thus Stier laid it on the line, and the officers and Executive Board members had and have no reason to claim they did not know what they had to do and what they should not do insofar as Michael Sciarra was concerned. To make sure there was no mistake, Stier conferred with Michael Sciarra and gave him the same message. Michael Sciarra had been exerting pressures upon and had been abusive towards the funds' Executive Director Santonello. On March 29 Stier spoke with Sciarra to inform him that such conduct must cease and that if it did not he would apply to the court for further relief. Sciarra agreed to back off.

After those series of meetings Daniel Sciarra agreed to accept appointment to one of the trustee vacancies. Stier appointed him on April 13. In May Stier informed Daniel Sciarra that he wished to fill the remaining employee position on the fund board and asked for a suggestion. Sciarra took the matter under consideration and returned with the recommendation of Robert Marra. Stier appointed Marra on May 11, 1989.

In late October Stier concluded that it would make good sense to broaden the base of union participation in the work of the funds and decided to appoint an alternate employee trustee. The alternate would be available when the time came to terminate the union trusteeship and to replace Stier on the fund board. Stier spoke to the Local's attorney, Paul Montalbano, and asked him to obtain a suggestion from the Board. Despite all that had gone before, Montalbano reported back that the Executive Board "wants somebody's brother as the trustee," meaning, of course, Michael Sciarra. Stier rejected this proposal out of hand and suggested that he would appoint no one. Montalbano asked him to wait until he again could confer with the Board. He did so and returned this time with the recommendation of Peter Granello, whom Stier promptly appointed as alternate fund trustee.

The foregoing events demonstrate Michael's Sciarra's hold on the present officers and Executive Board members of Local 560. They are further evidence of Michael Sciarra's determination to dominate both the Local itself and also the benefit

funds. The October 1989 appointment of Granello has not put a halt to Sciarra's efforts and it has not persuaded the Board of the inappropriateness of his becoming a fund trustee. On February 12, 1990 at a meeting of the TENJ Board, Michael Sciarra entered with a large group of business agents, delivered a heated criticism of the fund Board, discussed two pending contracts and left. After he left business agent Fred Mezzina, who remained at the meeting, made an impassioned speech urging the appointment of Michael Sciarra to the fund's board. Thereafter Daniel Sciarra stated to Stier, "I want my brother to be a trustee."

On March 21, 1990 during the hearing on the government's present application, Robert Marra testified that he, Daniel Sciarra and Granello each stand ready to get off the fund board in order to provide a seat for Michael Sciarra.

*c. Summary of Findings Concerning Sciarra:* I find on the basis of the evidence in its entirety that the government is likely to prevail on the merits of its claim that Michael Sciarra is in a position to and does exercise extraordinary influence over the officers and Executive Board members of Local 560, that the members of Local 560 look to him as their leader and that as a result he is virtually the de facto President of Local 560, limited only by the restraining presence of the court appointed trustee, Edwin H. Stier. The evidence also demonstrates that the government is likely to prevail on the merits of its claim that Michael Sciarra, with the continuing assistance of Local 560's officers and Executive Board members, has sought to obtain appointment as a trustee of the benefit funds and that these efforts have been frustrated only by reason of Stier's presence as court-appointed trustee.

## C. Conclusions of Law

This is an application for additional injunctive relief, namely an order further enjoining Michael Sciarra from holding any position of trust within Local 560 or its benefit plan system.

The grant of a preliminary injunction requires consideration of four factors: (1) whether the applicant has made a strong showing of probability of success on the merits of the litigation; (2) whether the applicant will be irreparably injured pendente lite if relief is not granted; (3) the probability of harm to other parties if the injunction is granted or denied; and (4) the effect upon the public interest of the grant or denial of the injunction. I weighed all these factors before issuing the order preliminarily enjoining Sciarra from running for the office of President. The purpose of that order was to prevent Sciarra from becoming President, because were he to assume that office there was a strong likelihood that he would lead Local 560 back into the control of the Genovese Organized Crime Family. The evidence submitted at the recent hearing shows that Michael Sciarra, through his position as business agent, has assumed the power which the outstanding preliminary injunction was intended to keep from him. The findings which formed the basis for the 1988 preliminary injunction require extension of that injunction to include the relief which the government now seeks. To deny the government's application would render the 1988 preliminary injunction a nullity. I incorporate herein the analysis contained in the 1988 opinion.

The new evidence only serves to fortify the conclusions reached in 1988.

As long as Michael Sciarra holds any position within Local 560 he will be able through his forceful and dominating personality, through his hold on a large and vocal segment of the membership and by virtue of the inexperience and subservience of the present officers and Board members, to dominate and control the Local. His continued presence presents a Hobson's choice. Either the court trusteeship will have to be continued indefinitely to prevent renewal of organized crime control or else the trusteeship can be terminated with the likely result that once again organized crime will assert its influence. Given a chance to be their own bosses the present officers and Board members may well have the ability to do the job for which they

were elected. The presence of Michael Sciarra prevents them from being their own bosses.

The new evidence highlights the risks to the benefit funds which Michael Sciarra's presence entails. The funds were a prime target and victim during the Provenzano years. It is true that Michael Sciarra, if appointed to the fund board would be only one of six trustees. He, however, has demonstrated the ability he has to influence the other employee trustees. At the hearing Stier explained with considerable cogency why the employer trustees might find it difficult to resist pressures from the employee trustees. Asked how one employee trustee could overcome the resistance of honorable employer trustees, Stier testified:

Over time it could happen in two ways, a combination of those two ways. One is to pressure other trustees into making decisions that create opportunities for racketeer exploitation of a union by replacing service providers gradually, one at a time, and put in place people that you are able to do business with in an improper way.

Secondly, by taking over direct control of the administration, day-to-day administration of the funds, gives you a great deal of power to make decisions that result in personal benefits that the trustees might never know about.

.     .     .     .     .

First of all, by being the spokesman for the beneficiaries of the funds, the people who—for whom these funds exist gives [the employee trustees], I think, a kind of credibility in dealing with trustees that employer trustees don't necessarily have. These are the people who are speaking for the people who are supposed to be benefiting from the funds.

Secondly, if you have employers who are representatives of companies that have contracts with the union, they become vulnerable to economic pressures.

Transcript at 165, 167.

Thus the threat of irreparable injury has been established even more persuasively than it was at the time of the 1988 hearing.

Moreover the threat then was that Sciarra, if nominated, might win the union's presidency. Now he is actually exercising power.

There can be no question that the additional injunctive relief will cause Michael Sciarra personal injury. He will lose a job and salary and his ambitions will be thwarted, for the time being at least. However, in the light of hindsight it is apparent that he should never have been permitted to assume the position of business agent, and his personal losses are outweighed by the long-term interests of the union in maintaining its democratic governances, eliminating the threat of racketeering influences and then bringing the court mandated trusteeship to an end. Similarly the public's interests referred to in my previous opinion far outweigh Michael Sciarra's personal interests.

The union's and Sciarra's attorneys urged that I withhold granting preliminary relief at this time because the case has been pretried and a final determination can be made upon the completion of a trial. This suggestion had merit and I offered to try the case in May or June 1990. However, through no fault of their own the defense attorneys were unable to proceed because of prior court commitments. I do not believe that the present situation can be allowed to continue until next fall or even later, and consequently the preliminary injunction will be expanded to enjoin Michael Sciarra from continuing as a Local 560 business agent, from holding any other position within Local 560 and from seeking to exert influence or control over the affairs of Local 560 or any of its benefit plans.

The government is requested to submit an appropriate order.