**UNITED STATES of America**

v.

**LOCAL 560 (I.B.T.),**

**Nominal Defendant (Intervenor), Appellant in No. 91–5440,**

**and**

**Michael Sciarra; Joseph Sheridan, Michael Sciarra, Appellant in No. 91–5441.**

**Nos. 91–5440, 91–5441.**

United States Court of Appeals, Third Circuit.

Argued Feb. 10, 1992.

Decided Aug. 18, 1992.

Michael Chertoff, U.S. Atty., Colette R. Buchanan (argued), Asst. U.S. Atty., Michael Chagares (argued), Asst. U.S. Atty., Robert C. Stewart, Asst. U.S. Atty., Newark, N.J., for appellee.

Samuel J. Buffone (argued), Terrance G. Reed, Asbill, Junkin, Myers & Buffone, Washington, D.C., Michael Critchley, West Orange, N.J., Paul Montalbano, Schneider, Cohen, Solomon, Leder & Montalbano, Cranford, N.J., for appellant in 91–5440, Local 560.

Peter V. Ryan (argued), West Orange, N.J., for appellant in 91–5441, Michael Sciarra.

Albert G. Kroll, Verona, N.J., for amicus curiae, New Jersey State AFL–CIO, in support of appellants.

Before: BECKER, ROTH, and HIGGINBOTHAM, Circuit Judges.

## TABLE OF CONTENTS

 PAGE

I. FACTS AND PROCEDURAL HISTORY ............................... 322
- A. The Local 560 Litigation ......................................... 322
- B. Events Leading to Issuance of the Permanent Injunction Against Sciarra ...................................................... 324
- C. Summary ................................................... 328

II. SCIARRA'S PROCEDURAL OBJECTIONS ............................. 328

III. SUFFICIENCY OF THE EVIDENCE TO SUPPORT ISSUANCE OF THE PERMANENT INJUNCTION ........................................ 330
- A. What the Government Must Prove to Obtain Modification of the Injunction ................................................... 331
- B. Sufficiency of the Evidence ....................................... 333

IV. ADMISSIBILITY OF THE IANIELLO/ANDRETTA TAPES AGAINST SCIARRA ...................................................... 337
- A. Were Sciarra and the Genovese Family Members Co–Conspirators? ... 338
- B. Were the Statements Made During the Course of the Conspiracy? ... 338

V. LOCAL 560'S STANDING TO OBJECT TO THE INJUNCTION .......... 339
- A. Overview of Organizational Standing ............................... 339
- B. Concrete Injury ............................................... 340
- C. Relationship to Organizational Purpose ............................ 341

PAGE
VI. LOCAL 560'S FIRST AMENDMENT OBJECTIONS TO THE INJUNC-
TION ............................................................. 342
 A. Introduction ................................................... 342
 B. Does the Injunction Violate Local 560's Members' Associational
 Rights? ........................................................ 342
 1. Is There a Compelling Governmental Interest? .................. 343
 2. Is the Injunction Sufficiently Narrowly Tailored? ............... 344
 a. Ban on Officeholding ...................................... 344
 b. Other Restrictions of the Injunction ........................ 344
VII. LOCAL 560'S OBJECTIONS TO THE INJUNCTION BASED ON LMRDA... 346
 A. Section 411(a)(1) ............................................... 346
 B. Section 411(a)(2) ............................................... 346
VIII. VALIDITY OF THE INJUNCTION UNDER RICO ...................... 347
IX. CONCLUSION ..................................................... 348

## OPINION OF THE COURT

BECKER, Circuit Judge.

This case arises from the government's ongoing effort to purge Local 560, International Brotherhood of Teamsters ("Local 560," or "the local"), of the influence of organized crime. Through the use of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. §§ 1961 to 1968 (West, 1984 and 1992 Supp.), the government has, over the past ten years, succeeded in imposing a trusteeship on the local and in obtaining court orders enjoining corrupt individuals from participating in the affairs of Local 560. This appeal concerns the government's efforts to prevent Michael Sciarra, a former Local 560 president and business agent alleged to have links to organized crime, from participating in the union's affairs.

The government presented evidence to the district court that, despite prior injunctions issued against some of Local 560's members, including Sciarra, Sciarra was undeterred in his efforts to retain a role in Local 560 for the Genovese organized crime family. As a result, the district court issued a detailed permanent injunction which enjoined Sciarra from, among other things, holding any position of trust in the local and from attempting to influence the local's affairs. Both Sciarra and Local 560 appeal from the entry of the injunction against him.

Sciarra points out that the government never filed a formal complaint in the district court pursuant to Rule 3 of the Federal Rules of Civil Procedure ("FRCP") in seeking this latest injunction, and submits that the district court therefore lacked subject matter jurisdiction to issue it. He also argues that there was insufficient evidence to demonstrate that he was frustrating the purposes of the original, less restrictive injunction issued against him, and that the district court was therefore not entitled to issue this more drastic injunction. Finally, he contends that tapes of recorded conversations between Genovese Family members, which were considered by the district court in deciding to issue the injunction, were erroneously admitted as co-conspirator statements under Rule 801(d)(2)(E) of the Federal Rules of Evidence ("FRE").

The government responds that its complaint in this portion of the ongoing Local 560 action was an amendment to the original complaint and that, therefore, no new complaint was necessary to initiate this portion of the litigation. Further, the government points to several pieces of evidence which suggest that Sciarra had corrupt dealings with organized crime after entry of the initial injunction against him and contends that this evidence is sufficient to support the more drastic injunctive relief granted by the district court. Finally, the government submits that the tape-recorded conversations admitted against Sciarra were properly received as co-conspirators' statements under FRE 801(d)(2)(E).

On behalf of its membership, Local 560 objects to the injunction because, it claims, the injunction impermissibly infringes on its members' First Amendment association-

al rights. The local also urges that the injunction infringes on its members' statutorily protected rights under the Labor Management Reporting and Disclosure Act (LMRDA), 29 USCA §§ 401 to 531 (West, 1985 and 1992 Supp), and that section 1964(a) of RICO does not authorize such an injunction. The government concedes that the injunction will infringe on the associational rights of Local 560's membership under the First Amendment and LMRDA, but argues that the injunction is justified because it is narrowly tailored to further a compelling governmental interest.

For the reasons that follow, we reject the claims of Sciarra and the local and will affirm the judgment of the district court in all respects.

## I. FACTS AND PROCEDURAL HISTORY

### A. *The Local 560 Litigation*

Although the government here seeks an injunction only against Sciarra, a review of the lengthy government-initiated litigation against Local 560 is necessary to understand the issues in the present appeal.[1]

In March 1982, the government filed a civil complaint against twelve individuals affiliated with Local 560 who, the government alleged, were involved in facilitating organized crime's control of Local 560. Five of these individuals—Anthony Provenzano, Nunzio Provenzano, Steven Andretta, Thomas Andretta, and Gabriel Briguglio—

were alleged to be associates of the "Provenzano Group," an organization affiliated with the Genovese organized crime family. The remaining seven defendants—Salvatore Provenzano, Joseph Sheridan, Josephine Provenzano, J.W. Dildine, Thomas Reynolds, Stanley Jaronko, and Michael Sciarra—were the members of the Executive Board of Local 560 at the time. The government claimed that this latter group of individuals had aided and abetted the Provenzano group in using Local 560 for corrupt ends.

In its complaint, the government alleged that all twelve individuals had violated 18 U.S.C.A. § 1962(c) [2] by engaging in a pattern of racketeering activity, which included murder, numerous acts of extortion, and labor racketeering. See *United States v. Local 560 (IBT)*, 581 F.Supp. 279, 333–34 (DNJ 1984). The government sought injunctive relief under 18 U.S.C.A. § 1964(a) [3] which would prohibit the five members of the Provenzano Group from having any dealings with Local 560 or its membership. Against the remaining seven individuals, the government sought an injunction barring them from acting in any official capacity on behalf of Local 560. The government further sought to impose a trusteeship on Local 560; the trustee would perform all the functions of the former Executive Board until the environment in the union was appropriate for a free election.

In 1984, after a lengthy trial, the district court granted the relief that the govern-

---

**1.** Prior reported opinions in this matter, some of which detail the procedural history of this litigation, are: *United States v. Local 560*, 694 F.Supp. 1158 (DNJ), aff'd, 865 F.2d 252 (3d Cir.1988); *United States v. Sciarra*, 851 F.2d 621 (3d Cir.1988); and *United States v. Local 560*, 581 F.Supp. 279 (DNJ 1984), aff'd, 780 F.2d 267 (3d Cir.1985). The district court's published opinions related to the present litigation are *United States v. Local 560*, 754 F.Supp. 395 (DNJ 1991), and *United States v. Local 560*, 736 F.Supp. 601 (DNJ 1990).

**2.** 18 U.S.C.A. § 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of

such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**3.** 18 U.S.C.A. § 1964(a) provides:

The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any persons, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

ment sought. As a result, the members of the Provenzano Group were prohibited from having any dealings with Local 560. Michael Sciarra and the six other members of the Executive Board were prohibited from acting in an official capacity on behalf of Local 560. Additionally, the court imposed a trusteeship "for such time as is necessary to foster the conditions under which reasonably free supervised elections can be held, presumptively for eighteen months." See *Local 560*, 581 F.Supp. at 337.

The imposition of the trusteeship was stayed until all appeals had been resolved. We affirmed the issuance of that injunction. See *Local 560*, 780 F.2d at 267. On June 23, 1986, the trusteeship was put in place. Thus, more than two years passed between the district court's order calling for a trusteeship and the actual creation of the trusteeship. During that time, Michael Sciarra succeeded Salvatore Provenzano as the president of Local 560. As we will see, Sciarra's actions during the two years that he was president of the local are relevant to the determination whether he should now be enjoined from participating in all the affairs of Local 560.

Several orders sought by the government during the ongoing trusteeship of Local 560 generated controversies that required the district court's and our consideration and are relevant to the present appeal. Among these was an order to show cause issued by the district court in 1988 against Sciarra and Joseph Sheridan, another of the allegedly corrupt officials of Local 560. The order required Sciarra and Sheridan to show cause why they should not be compelled to submit to oral depositions concerning their stewardship during the two-year period in which Sciarra served as president while the appeal was pending. The district judge issued the order at the government's request and over the objection of Sciarra and Sheridan.[4] On appeal, we affirmed the order to show cause because Sciarra and Sheridan had not demonstrated Article III injury. See *Sciarra*, 851 F.2d 621.

During the period of trusteeship, the trustee, Edwin Stier, attempted to create an environment in Local 560 in which uninhibited union democracy could flourish. His efforts were vigorously opposed by a group known as Teamsters for Liberty, which severely criticized the trusteeship. Among the Teamsters for Liberty's adherents were Sciarra, Sheridan, and other individuals who had formerly been found to be under the influence of the Provenzano Group. Despite the emergence of these anti-trusteeship forces, Trustee Stier concluded in 1988 that Local 560 was sufficiently purged of corruption and intimidation to permit free elections. Pursuant to an order obtained from the district court, Stier scheduled an election for officers of the Executive Board, to be held in November 1988.

The Teamsters for Liberty proposed to run Sciarra and Sheridan for Local 560 President and Vice President, respectively, in the November 1988 election. The government, concerned that Sciarra and Sheridan would return control of the local to the Provenzano Group and the Genovese Family, sought an injunction against the candidacies of both men. It did so by filing an "Application for Additional Relief" with the district court. In the Application, the government asserted that Sciarra had remained under the influence of the Genovese Family during the period in which he served as president of Local 560. The Application further alleged that the Genovese Family had designs on Local 560 and that Sciarra was crucial in their plan to reassert control.

The district court treated the government's Application as a motion to amend or supplement the complaint pursuant to Rule 15(a) of the FRCP. After conducting a hearing in September 1988, the court agreed with the government that Local 560 might again become corrupt if a Sciarra/Sheridan ticket were to be victorious; the court therefore temporarily enjoined

---

4. The district judge simultaneously denied Sciarra and Sheridan's motion for recusal. For a detailed discussion of the recusal issue, see *Sciarra*, 851 F.2d at 624–26, 633–36.

Sciarra and Sheridan from running in the upcoming election. See *Local 560*, 694 F.Supp. at 1158. We affirmed the issuance of that temporary injunction by judgment order. See *Local 560 (IBT)*, 865 F.2d 253.

Undaunted, the Teamsters for Liberty nominated Daniel Sciarra, Michael Sciarra's brother, to run for President of Local 560 and Mark Sheridan, Joseph Sheridan's nephew, to run for Vice President. The election was held on December 6, 1988. In balloting that was apparently fair, the Teamsters for Liberty candidates won. Upon assuming office in January 1989, the new Executive Board almost immediately appointed Michael Sciarra and Joseph Sheridan business agents of the local. The government obtained an order that required both Joseph Sheridan and Michael Sciarra to show cause why they should not be prohibited from holding office in Local 560. The district court initially concluded that there was insufficient evidence to enjoin Sciarra and Sheridan from holding the office of business agent, and both men began serving in that capacity.

A little more than a year later, in early 1990, the government entered into an agreement with Joseph Sheridan whereby Sheridan consented to resign as a business agent of Local 560 and to cease attempting to influence its affairs. The government apparently sought the agreement because it believed that Sheridan was still involved in corrupt activities. In February 1990, the government moved, on the basis of new evidence, to bar Michael Sciarra from holding any position of trust in the union. The district court, after holding a hearing, granted a preliminary injunction prohibiting Sciarra from "continuing as a Local 560 business agent, from holding any other position within Local 560 and from seeking to exert influence or control over the affairs of Local 560 or any of its benefit plans." See *United States v. Local 560 (IBT)*, 736 F.Supp. 601, 613 (D.N.J.1990).

Shortly thereafter, the court began proceedings to determine whether a permanent injunction should issue. After a trial, at which both sides offered evidence, the district court concluded that any exercise of influence by Sciarra would be dangerous to the corruption-free environment of Local 560. Based on section 1964(a) of RICO, the court therefore enjoined Sciarra as follows:

Michael Sciarra ... is hereby permanently enjoined and prohibited from doing any of the following, to wit:

1. From serving in or otherwise holding any position of trust or employment within and from rendering any form of service (whether or not for remuneration) to Local 560 (IBT) or any of its benefit plans;

2. From attending and otherwise participating in any membership meeting, function or rally—including any public or private demonstration of support for any strike action—sponsored by or otherwise involving Local 560 (IBT), provided, however, that he shall not be precluded from casting a ballot in any election or on any questions if that can be done without attending a meeting of the membership;

3. From attending and otherwise participating in any political rally, fund-raiser or other function of whatever kind or description relating to the political affairs of Local 560 (IBT);

4. From otherwise endeavoring, directly or indirectly, to influence the affairs of Local 560 or any of its benefit plans; and

5. From frequenting the union hall at 707 Summit Avenue, Union City, New Jersey except to the minimum extent necessary to discharge, without any unreasonable delay, a matter of personal union membership-related business, providing that any such matter cannot be reasonably discharged by means of telephone or correspondence.

Both Sciarra and Local 560 have appealed from the entry of this permanent injunction. We have appellate jurisdiction under 28 U.S.C.A. § 1291 (West, 1966 and 1992 Supp.).

B. *Events Leading to Issuance of the Permanent Injunction Against Sciarra*

The facts justifying entry of the original injunction against Sciarra in 1984, which prohibited him from representing Local 560 in an official capacity, are detailed in the

district court's original opinion. See *Local 560*, 581 F.Supp. at 302–03, 325. It suffices to say for present purposes that Sciarra was involved in creating a corrupt environment in Local 560 before 1982. His own testimony at the first proceeding that he would welcome members of the Provenzano Group back into Local 560 even though they had ordered the murders of those who opposed their interests and had corrupted Local 560, see id, was sufficient to justify entering the initial injunction against him under 18 U.S.C.A. § 1964(a).

In this appeal, however, we are concerned primarily with Sciarra's conduct *after* the district court entered the initial injunction. To expand the scope of the injunctive relief against Sciarra, the government must show that events subsequent to that injunction justify additional relief.[5] In the present phase, the district court found that, despite the first injunction, Sciarra was undeterred in his willingness to open Local 560 to the corrupting influence of the Genovese Family and the Provenzano Group. This conclusion was based on evidence adduced at various proceedings before the district court which suggested that Sciarra is under the influence of the Genovese Family and that he, in turn, can control the local with minimal contact, and thereby return Local 560 to Genovese Family control. More specifically, the district court held that several pieces of evidence, which we now detail, demonstrated an ongoing violation of 18 U.S.C.A. § 1964 that justifies prohibiting Sciarra from attempting to influence the local in any way.

### 1. Intercepted Wire Conversations

First, the district court relied on a series of tape-recorded conversations between various individuals affiliated with the Provenzano Group and the Genovese Family. The government claims that the conversations, which primarily concerned the Provenzano Group's efforts to retain control over Local 560 after entry of the district court's injunction, demonstrate the contin-

ued involvement of Sciarra in organized crime.

The tapes recorded the following conversations: 1) a conversation between Matthew Ianiello, a so-called "captain" in the Genovese Family, and Stanley Jaronko, a member of the Executive Board of Local 560, concerning how the Genovese Family would retain control over the local after the district court's initial decision imposing the trusteeship; 2) two conversations between Ianiello and Stephen Andretta, also concerning how the Genovese Family could retain control over Local 560; and 3) a conversation among Anthony Salerno, the then-boss of the Genovese Family, Louis Gatto, a captain in the Family, and two other individuals concerning how the Genovese Family could retain control over Local 560. During all four of these conversations, the participants discussed controlling the local through "Michael," "Mike," "Mikey," or "Mikey Sciarra."

The district court agreed with the government that the tapes demonstrated that the Genovese Family was attempting to maintain control over Local 560 by controlling Michael Sciarra:

> The tapes constitute strong evidence that the Genovese Crime Family intended to maintain its control over Local 560 during the pendency of the appeal from Judge Ackerman's March 16, 1984 Judgment Order, during any period of trusteeship, and thereafter. The tapes constitute strong evidence that this control was to be exercised through Anthony Salerno's caporegime Matthew Ianiello and that Ianiello, upon the advice of Stephen Andretta, selected Michael Sciarra to be the man on the scene at Local 560 to whom orders and instructions could be given.

*Local 560*, 694 F.Supp. at 1178.

### 2. The New England Motor Freight "Sweetheart" Deal

The government also presented evidence in the district court that there was a "sweetheart" relationship between Local

---

**5.** As we discuss in more detail later, the government need not, as Sciarra asserts, demonstrate a new RICO violation to justify issuance of the injunction. See pages 330–33.

560 and a trucking company, New England Motor Freight (NEMF), from 1975 through mid–1986, and that Sciarra facilitated the relationship during its latter stages. NEMF was party to a collective bargaining agreement with a bargaining unit affiliated with Local 560. Moreover, until 1977, NEMF was party to the Teamsters National Master Freight Agreement (NMFA), the industry-wide agreement governing the trucking industry. The government presented evidence that during the 1970s, Myron Shevell, NEMF's president, cultivated a corrupt relationship with various officials inside Local 560, including Anthony Provenzano and Stephen Andretta. The leadership of Local 560 agreed with Shevell in the late 1970's to allow NEMF to deviate from the NMFA in its employment practices. This allowed NEMF to expand its non-unionized workforce and gradually to decrease the size of the Local 560 collective bargaining unit that was working at NEMF. Although the record is not entirely clear on this point, the leadership of Local 560 apparently received some benefit in return.[6]

Evidence presented in the district court suggested that the corrupt arrangement between Local 560 and NEMF continued beyond the entry of the initial injunction in 1984. Three pieces of evidence link the corrupt post-injunction dealings between NEMF and Local 560 during this period to Sciarra.

First, in 1983, Salvatore ("Sammy") Provenzano, then the president of Local 560, became disenchanted with the local's arrangement with NEMF and directed that a grievance be filed against NEMF alleging unfair labor practices. The grievance asserted that all NEMF warehousemen and drivers were covered by the NMFA and that NEMF, in deviating from the terms of the NMFA, had engaged in an unfair labor practice. But not everyone in the Provenzano Group and the Genovese Family was pleased by the souring of relations between Local 560 and NEMF. The recorded conversations between Ianiello and Andretta

reveal that they wanted to undo Provenzano's effort to punish NEMF through the grievance procedure. Ianiello suggested a way to do so during their December 7, 1984 conversation:

> *Ianiello:* Michael's business. Let's let Michael try to square it (unintelligible).
>
> *Andretta:* Sammy [Provenzano], but Sammy got shoved out of the office. He's gotta step down, he kept pushing the guy. Instead of letting him go, nobody gets in trouble.
>
> *Ianiello:* Yeah, I wanted to do it.
>
> *Andretta:* He came to tell Mikey last month (unintelligible). He says don't let up on the fucking guy. Crucify and bury him. I said no you gonna get five guys locked up with the mother fucker.
>
> * *Ianiello:* Don't do it. Tell Mikey not to do it.

*Local 560*, 754 F.Supp. at 404. The district court found that this was a reference to allowing Sciarra to repair damaged relations with NEMF. See *Local 560*, 754 F.Supp. at 404; *Local 560*, 694 F.Supp. at 1179.

Second, Sciarra's actions during 1984 and 1985 demonstrate that he was attempting to solidify the corrupt relationship between NEMF and Local 560. In January 1985, Sciarra sent a proposed collective bargaining contract to NEMF's attorney, which the district court found was unreasonably favorable to NEMF. The district court further found that Sciarra sent this collective bargaining agreement to NEMF in order to preserve the corrupt relationship and to prevent officials at NEMF from revealing its corrupt dealings with certain individuals affiliated with Local 560, including Ianiello and Andretta.

Third, the district court found that the behavior of Daniel Rubino, Local 560's business agent for NEMF, demonstrated that Sciarra was under the influence of the Genovese Family in conducting Local 560's affairs. Rubino testified at grievance proceedings twice—once while Salvatore Pro-

---

**6.** The government has not stated precisely what benefit accrued as a result of the relationship and has not identified who benefited. The tapes

do make reasonably clear, however, that there was some benefit for Provenzano Group members.

venzano was president of Local 560 and once while Sciarra was president. The critical issue in Rubino's testimony was whether "past practices" in NEMF's relationship with Local 560 justified NEMF's deviations from the NMFA. When Provenzano was president and was vigorously pressing grievance claims against NEMF, Rubino testified that no such past practices had occurred, thereby advancing Provenzano's desire to punish NEMF. After Sciarra had become Local 560's president, however, and the Genovese Family was trying to appease Shevell, Rubino testified extensively that there had been past practices and gave numerous details. See *Local 560*, 754 F.Supp. at 404; *Local 560*, 694 F.Supp. at 1180–81. The district court found that this evidence "tend[s] to confirm that Sciarra was implementing Ianiello's and Andretta's instructions." *Local 560*, 754 F.Supp. at 404.

Based on these three pieces of evidence, the district court concluded that Sciarra was following instructions from the Genovese Family about NEMF in order 1) to prevent disclosure of past criminal dealings between the company and Genovese Family members affiliated with Local 560 and 2) to preserve the improper relationship between the local and NEMF. *Id.*

### 3. Sciarra's Retention of Corrupt Officials

The district court also found that Sciarra's decisions with regard to the administration of the welfare and benefit funds of Local 560 demonstrate that he was still under the influence of the Genovese Family. Two instances of conduct were relevant to the district court's decision. First, Sciarra declined to remove Marvin Zalk from the position of Administrator of the Local 560 Welfare Plans despite Zalk's 1983 conviction for obstruction of justice with regard to the Local 560 Dental Plan and despite the district court's clear finding in the first proceeding that Zalk had long been involved in the Provenzano Group's efforts to use Local 560 and its benefit funds for organized crime purposes. See *Local 560*, 581 F.Supp. at 285. Sciarra attempts to justify this decision on the grounds that Zalk was an effective administrator, but the district court found that the Zalk appointment was evidence that Sciarra remained under the influence of the Genovese Family after 1984.

Second, Sciarra voted to extend a lucrative contract with the law firm of Citrino, Balsam, and DiBiasi to provide legal services to union members despite strong evidence that the firm's services were valueless to the membership of Local 560 and despite evidence that some of the law firm's members were corrupt. The firm had been retained in the late 1970s by another local, which subsequently merged into Local 560. After the merger, the legal services plan provided services only for those who had formerly been members of the old local. In mid–1984, however, the leadership of Local 560 sought to expand the legal services plan to provide coverage for all members of Local 560. Sciarra, acting as a member of the Executive Board, helped create this plan despite the fact that Citrino, Balsam and DiBiasi had never accounted for any of the $500,000 that had been paid to them previously and despite the indictment of partner Thomas DiBiasi on bank fraud charges.

The Executive Board also approved a $50,000 "advance" for DiBiasi, which was never formally accounted for. Additionally, the firm's managing partner, L. William Balsam, was suspended from the practice of law in January 1985. Nevertheless, Sciarra, acting as a trustee of the Legal Services Plan, voted to give the firm a new three-year contract in April 1985. The district court concluded that these actions "must be viewed as corroborative of Sciarra's ... continued participation in the Genovese Family conspiracy to maintain control of Local 560 in violation of RICO." *Local 560*, 694 F.Supp. at 1184.

### 4. Evidence Based on Sciarra's Service as a Business Agent in 1989 and 1990

The district court also relied on Sciarra's service as a business agent for Local 560 in 1989–90 to demonstrate his domination by

the Genovese Family and the continued danger to Local 560. The district court found that the elected leaders of Local 560 in 1989 and 1990, Daniel Sciarra and Mark Sheridan, were leaders in name only. The district court found that Michael Sciarra was able to use his position as business agent to dominate the local's affairs, which, in turn, placed Local 560 under the influence of the Genovese Family. The court further found that Sciarra was exercising control both over the affairs of the local and over the administration of Local 560's benefit and pension funds.

In reaching its conclusion, the district court relied heavily on videotapes of union meetings at which Sciarra spoke. The court's opinion details the enormous deference that the membership accorded Sciarra when speaking and his role in running the meetings. See *Local 560*, 736 F.Supp. at 607–10. The court concluded from observation of the tapes that they were "further evidence of Michael Sciarra's determination to dominate both the Local itself and also the benefit funds." Id. at 611–12.

The court also found that Sciarra attempted to become a fund trustee of the Local 560 pension and welfare funds, and that, but for the continued presence of the Trustee Edwin Stier, the Executive Board would have appointed him to such a position. The court found that at Executive Board meetings, Daniel Sciarra sought access for his brother to a trustee position. Despite the admonitions of Trustee Stier, members of the Executive Board continued to attempt to appoint Michael Sciarra to a trustee position. Robert Marra, one of the fund trustees, testified that he and two other employee fund trustees stood ready to step aside as trustees to provide room for Michael Sciarra as a fund trustee. The district court concluded that this behavior further evidenced influence by the Genovese Family.

Finally, the court also concluded, based on Sciarra's own testimony, that Sciarra was still meeting with members of the Genovese Family. Sciarra himself admitted that he met with a driver for the Genovese Family, Jimmy Ida, at least seven times between 1987 and 1989. Additionally, surveillance revealed that Sciarra met with a caporegime in the Genovese Family, Stephen Andretta, at a diner during 1990. The district court inferred from this that Sciarra was receiving instructions about how to conduct the affairs of Local 560 to the Genovese Family's benefit.

### C. *Summary*

From all of the evidence, the district court concluded:

> As long as Michael Sciarra holds any position within Local 560 he will be able through his forceful and dominating personality, through his hold on a large and vocal segment of the membership and by virtue of the inexperience and subservience of the present officers and Board members to dominate and control the Local. His continued presence presents a Hobson's choice. Either the court trusteeship will have to be continued indefinitely to prevent renewal of organized crime or else the trusteeship can be terminated with the likely result that once again organized crime will assert its influence.

*Local 560*, 736 F.Supp. at 612. Consequently, the court entered the injunction barring Sciarra from attempting to influence the affairs of Local 560. See page 324. Both Sciarra and Local 560 appeal, alleging numerous errors in the district court's decision. We consider Sciarra's arguments first.

### II. SCIARRA'S PROCEDURAL OBJECTIONS

Sciarra raises a number of procedural objections to the government's effort to obtain a broader injunction against him. Primarily, his arguments derive from the fact that no complaint was ever filed against him in the present proceedings seeking to bar him from all efforts to influence the union. Although he acknowledges that a complaint was filed against him and the other Local 560 defendants in 1982, he contends that that action terminated as of March 16, 1984, the date the initial injunction was entered against them.

We begin by acknowledging that the procedure that the government followed for commencing this portion of the action against Sciarra was, indeed, unusual. On July 18, 1988, the government filed an "Application for Additional Relief" with the district court. Ten days later, after a hearing, the government sought leave to have the Application treated as an Amended Supplemental Complaint, which the district court granted pursuant to Rule 15(d).[7] The court did so because, in the language of FRCP 15(a), it felt that "justice so require[d]."

Sciarra objects to the district court's permitting amendment of the original complaint in an action that had already terminated. For the government to seek additional relief, according to Sciarra, it was required to file an entirely new complaint. Sciarra's argument is bolstered by our statement in an earlier appeal in the Local 560 litigation that Sciarra and Sheridan were no longer parties to the litigation:

> [W]e conclude that [Sciarra and Sheridan] are, at this point, only non-party witnesses to an investigation, rather than parties to an actual case or controversy designed to adjudicate their substantive rights.

*United States v. Sciarra*, 851 F.2d 621, 630 (3d Cir.1988).

■ Sciarra argues that this procedural defect requires dismissal of the suit against him for three reasons. First, he asserts that there is no Article III case or controversy because, under FRCP 3, a case can only be commenced by the filing of an action. Second, he submits that there is no personal jurisdiction over him because no summons and complaint were ever served on him. See FRCP 4. Third, he contends that the March 16, 1984 order barred additional relief under the principle of res judicata. See *United States v. Athlone Indus-*

*tries,* 746 F.2d 977, 983 and 983 n. 4 (3d Cir.1984).

Whatever the merits of these arguments, we are foreclosed from considering them by the law of the case. In the prior appeal, *United States v. Local 560*, 865 F.2d 253 (3d Cir.1988), Sciarra appealed from the entry of a preliminary injunction that barred him from running in the election for president of the Local 560 Executive Board. The preliminary injunction was entered pursuant to the government's Application for Additional Relief, subsequently modified to become an amended and supplemental complaint. On appeal, Sciarra pressed precisely the same arguments about procedural defectiveness that he presses here. In affirming (by judgment order), we necessarily held that the district court had properly allowed the Application for Amended Relief to serve as an amendment to the original complaint.

■ When an appellate court decides a legal issue, that decision governs all subsequent proceedings in the same case. See *Devex v. General Motors*, 857 F.2d 197, 199–200 (3d Cir.1988). This rule promotes the "judicial system's interest in finality and in efficient administration." *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 165 (3d Cir.1982) (citations omitted). Had we found any merit in any of the three arguments just mentioned—that no case or controversy existed, that the court lacked personal jurisdiction over Sciarra, or that this claim for injunctive relief was precluded by the res judicata effect of the prior injunction—we would have been compelled to vacate the preliminary injunction entered by the district court. The first two arguments are jurisdictional, and, regardless of the merits, the absence of either subject matter or personal jurisdiction would have compelled us to dismiss the case. The third argument, concerning res judicata, if correct, would have precluded both preliminary and permanent relief, and also would

---

7. FRCP 15(d) provides in relevant part:
 Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occur-

rences or events which have happened since the date of the pleading sought to be supplemented. Permission may be granted even though the original pleading is defective in its statement of a claim for relief or defense.

have required dismissal of the case.[8] By affirming, we rejected those arguments, all actually pressed, on the merits, and our decision is the law of the case.

Sciarra attempts to avoid the preclusive effect of our affirmance by pointing out that we merely affirmed the grant of a *preliminary* injunction. He notes that a decision on the merits to grant (or to affirm the grant of) a preliminary injunction does not constitute the law of the case. That is, in subsequently deciding whether permanent relief should issue, the court is free to reconsider the merits of the case. See, for example, *William G. Wilcox D.O., P.C. v. United States*, 888 F.2d 1111, 1113 (6th Cir.1989); *Golden State Transit Corp. v. City of Los Angeles*, 754 F.2d 830, 832 n. 3 (9th Cir.1985).

■ Sciarra is correct that a trial court, in deciding whether to grant permanent relief, is not bound by its decision or the appellate court's decision about preliminary relief. The burden of proof on a moving plaintiff is different on a motion for preliminary injunction. Additionally, a decision on a preliminary injunction is, in effect, only a prediction about the merits of the case. See *Board of Trade v. Commodity Futures Trading Commission*, 605 F.2d 1016, 1020 (7th Cir.1979).

■ When, however, a party seeking a preliminary injunction files its complaint in a procedurally defective way that would require dismissal of the suit, either because the court lacks jurisdiction or for some other reason, and the defendant raises that objection on appeal, the appellate court's rejection of that argument on appeal becomes the law of the case. Unlike merits questions, on which there is a different standard of proof in the preliminary phase and the permanent phase, the procedural questions are the same in both phases. If a procedural defect would require dismissal

of the suit, the merits are irrelevant, and the court has no power to issue any relief, preliminary or otherwise. Because Sciarra raised these precise procedural arguments during his appeal from the preliminary injunction, by affirming and refusing to dismiss the suit we rejected those arguments, establishing the law of the case.

■ Finally, Sciarra argues that the injunctive relief entered against him cannot be modified because the initial action was terminated by entry of the 1984 injunction. Sciarra's argument ignores the well-established principle that courts may modify injunctions resulting from final orders at any time, pursuant to their more general power to modify or vacate any final decree. See *Board of Educ. of Oklahoma City Public Schools v. Dowell*, — U.S. —, —– —, 111 S.Ct. 630, 636–37, 112 L.Ed.2d 715 (allowing modification of desegregation decree where decree had achieved its purpose); *System Fed'n No. 91, Railway Employees Department, AFL–CIO v. Wright*, 364 U.S. 642, 646, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961); see also Charles Wright and Arthur Miller, 11 *Federal Practice and Procedure*, § 2960, at 581 (West, 1973 and 1992 Supp). Far from being impermissible, such modification has become a routine aspect of modern litigation. See Abram Chayes, *The Role of the Judge in Public Law Litigation*, 89 HarvLRev 1286, 1301–02 (1976) (discussing the trend and collecting cases).

We therefore reject Sciarra's argument that procedural defects in the government's July 1988 amended complaint require us to dismiss this action.

## III. SUFFICIENCY OF THE EVIDENCE TO SUPPORT ISSUANCE OF THE PERMANENT INJUNCTION

Sciarra contends that there was insufficient evidence to support issuance of the

---

**8.** Although some of Sciarra's arguments relate to subject matter jurisdiction, we are still bound by the law of the case because these precise arguments were raised and considered in the earlier appeal. See *In re Memorial Estates,* 950 F.2d 1364 (7th Cir.1991) (law of the case precluded court from reconsidering argument about subject matter jurisdiction); *Parker v.*

*King*, 935 F.2d 1174, 1178 (11th Cir.1991) (court's power to consider its own subject matter jurisdiction circumscribed by the law-of-the-case doctrine); *McCurry v. Tesch*, 824 F.2d 638, 640 (8th Cir.1987) (court bound by prior decision in the same case on issue relating to subject matter jurisdiction).

permanent injunction. Initially, he argues that to justify increasing the restrictions upon him, the government was required to prove that an entirely new violation of 18 U.S.C.A. § 1962(c) occurred after entry of the 1984 injunction, which barred him from holding any position of responsibility in Local 560. That would require the government to prove at least two fresh predicate acts of racketeering activity. Additionally, Sciarra argues that the government in fact failed to demonstrate that he had engaged in acts violative of section 1962(c) after issuance of the first injunction. We first consider Sciarra's argument that the government was required to prove fresh acts of racketeering activity. Second, we consider whether what it proved was sufficient to justify issuance of the new injunction.

### A. What The Government Must Prove to Obtain Modification of the Injunction

Sciarra argues that the issuance of the first injunction terminated the initial action against him, and that any additional relief requires that the government prove its RICO case anew. Sciarra, however, cites no cases in support of his position.

In entering the initial injunction against Sciarra, the district court found that he had aided and abetted members of the Genovese Family in their conduct of the affairs of Local 560 through a pattern of racketeering activity. See *Local 560*, 581 F.Supp. at 321. See also 18 U.S.C.A. §§ 1962(b), (d) and 18 U.S.C.A. § 2 (West, 1985 and 1991 Supp). The court consequently entered an injunction designed to foster a democratic environment in the local. The court's decision was based on "[Sciarra's] appointment in office of certain officials of Local 560 and in [his] discharge

of certain other duties, the collective impact of which has, in particular, directly contributed to the existence of the climate of intimidation within the Local." See 581 F.Supp. at 335.

In issuing its latest injunction, the district court concluded that the purpose—as well as the success—of the injunction in 1984 and the preliminary injunction in 1988 would be undermined absent an injunction barring Sciarra from attempting to influence the union's affairs. The district court explicitly found that the 1988 injunction would be a "nullity" absent the grant of additional relief, see *Local 560*, 736 F.Supp. at 612, and that the failure to issue the government's requested injunction would "crush the movement towards membership control and bring back the dark night of the strong arm and repression." *Local 560*, 754 F.Supp. at 407. The district court did not, however, make an explicit finding that Sciarra had committed a new RICO violation. See *Local 560*, 754 F.Supp. at 403. We consider first whether a mere finding that the purposes of the first injunction were being frustrated was sufficient to justify the new injunction issued against Sciarra.

 The hornbook rule regarding plaintiff's requests for modification of injunctive relief is that "modification is proper if the original purposes of the injunction are not being fulfilled in any material respect." Charles Wright and Arthur Miller, 11 *Federal Practice and Procedure*, § 2781, at 605 (West, 1973).[9] Accord *Commonwealth of Pennsylvania v. Local Union 542*, 807 F.2d 330, 334 (3d Cir.1986). That rule derives primarily from the Supreme Court's decision in *United States v. United Shoe Machinery Co.*, 391 U.S. 244, 247–249, 88 S.Ct. 1496, 1499–1500, 20

---

**9.** In the obverse situation, where a defendant requests modification of an injunctive decree entered against him or her, the court may modify the injunction if (1) there are changes in the operative facts, (2) there are changes in the relevant decisional law and (3) there are changes in the applicable statutory law. Those principles derive from the Supreme Court's decision in *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932); see also

*Rufo v. Inmates of Suffolk County Jail*, —— U.S. ——, ———–——, 112 S.Ct. 748, 757–59, 116 L.Ed.2d 867 (1992) (emphasizing flexibility district courts enjoy in choosing to modify decrees). We deal here with the opposite situation—where a plaintiff seeks to modify the injunction based on the inadequacy of the initial decree. Our decision should not be read to apply to cases where a defendant seeks modification.

L.Ed.2d 562 (1968), where the Court considered a district court's refusal to modify injunctive relief. *United Shoe* involved a shoe machinery manufacturer who, at the time the initial injunction was issued, had been held to have violated § 2 of the Sherman Antitrust Act by monopolizing the manufacture of shoe machinery. The plaintiff/government had requested a modification because, it claimed, the initial injunction was not wholly effective. The district court, relying on *United States v. Swift*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), held that it was powerless to issue modified injunctive relief more than ten years after the initial injunction because there had not been "a clear showing of grievous wrong evoked by new and unforeseen conditions." *United Shoe*, 391 U.S. at 247, 88 S.Ct. at 1499.

The Supreme Court reversed, holding that the district court had conceived the scope of its authority to modify the injunction too narrowly. The Court held that the district court had the power "to prescribe other, and if necessary more definitive, means to achieve the result." Id. at 1501. The appropriate test for whether a new injunction was justified was whether "time and experience have demonstrated" that "the decree has failed to accomplish" its objectives. Id. at 249, 88 S.Ct. at 1500. The Court further noted that each consideration of the request for modification "must be based upon the specific facts and circumstances that are presented." Id.

Although *United Shoe* arose in the context of an antitrust violation, we believe that that case's principles regarding modification of an injunction apply equally in cases involving injunctions under section 1964(a) of RICO.[10] Although we have not previously considered the precise question presented here—what the standard is for additional relief in the RICO context—several considerations suggest that the

government, as plaintiff, need only demonstrate that the purposes of the initial injunction are not being served and that additional injunctive relief is necessary to advance those purposes.

First, the broad statutory grant of powers under RICO suggests that courts should have continuing power to modify their equitable decrees when those decrees prove ineffective. We have previously noted that the district courts have broad equitable powers under section 1964 of RICO. See *United States v. Local 30, United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Association*, 871 F.2d 401, 407 (3d Cir.1989). Given that the power to issue RICO injunctions in the first place is extremely broad, it would be illogical to assume that district courts lack the power to modify such injunctions when they prove ineffective. Such a holding would hamstring the courts in a manner inconsistent with the purposes of RICO and would prevent them from acting effectively to eliminate corruption.

Second, we believe that the legislative history of RICO suggests that courts have the power to modify injunctions upon a showing that the purposes of the initial RICO injunction are being frustrated. The House Report states:

> Although certain remedies are set out, the list of remedies is not meant to be exhaustive and the only limit on remedies is that they accomplish the aim set out of removing the corrupting influence and make due provision for the rights of innocent persons.

H.R.Rep. No. 1549, 91st Cong., 2d Sess. 2, reprinted in 1970 U.S.S.C.A.N. 4007, 4034. That "the only limit" on district courts' power is that they must make due provision for the rights of innocent persons suggests that district courts are not hamstrung in their ability to modify equitable relief when appropriate. Further, that the

---

**10.** Professor Blakey, whose pioneering work was influential in the development of the RICO statute, has noted the close parallels between the Sherman Act and RICO, specifically with regard to the kinds of equitable relief that each provides for. See G. Robert Blakey, *The RICO Civil Fraud Action in Context: Reflections on*

*Bennett v Berg*, 58 Notre Dame L Rev 237, 253 (1982). Professor Blakey's work substantiates the theory that RICO's equitable provisions had their origins, at least in some part, in the antitrust laws, further supporting our conclusion that the rule of *United Shoe* regarding modification should apply in the RICO context.

Act allows courts to enjoin both present and future violations of the Act, see 18 U.S.C.A. § 1964(a), evidences a legislative purpose that the courts enjoy supervisory power over equitable litigation that must necessarily include the power to modify injunctions when they are ineffective.

We therefore reject Sciarra's argument that the government must prove a new RICO violation to justify the expansion of equitable relief. We hold that, to the extent that a modification is not inconsistent with the original holding of the district court and is necessary to accomplish the remedy sought by the original equitable decree, courts entering injunctions pursuant to 18 U.S.C.A. § 1963(a) may modify an initial decree when the purposes of that decree have not been effectuated.

### B. *Sufficiency of the Evidence*

█ The district court made numerous findings of fact to support its conclusion that additional injunctive relief was justified. We must decide whether there is sufficient evidence in the record to support the court's findings. See *United States v. Felton*, 753 F.2d 276, 278 (3d Cir.1985). We will disturb the court's factual findings only if they are clearly erroneous. See *Goldberg v. New Jersey Lawyers' Fund for Client Protection*, 932 F.2d 273, 277 (3d Cir.1991).

As we have noted, the court based its conclusions on four separate categories of evidence. In arguing that there was insufficient evidence, Sciarra attacks the district court's conclusions with respect to each category.

### 1. Intercepted Wire Conversations

█ The wire conversations demonstrate that there was contact between the Genovese Family and Sciarra at several points after entry of the initial injunction. For example, during the November 6, 1984 conversation, two captains in the Genovese Family, Stephen Andretta and Matthew Ianiello, made arrangements for sending messages to Sciarra about the Genovese Family's desires with regard to Local 560:

Andretta: ... I don't see Mikey at all but ah ... you know.

Ianiello: He knows you're close with me don't he?

Andretta: Mikey.

Ianiello: Does he know you're close to me?

Andretta: Well he might. He might think I'm not.

Ianiello: Well ... I'll send word to him. I'll make sure he knows that you can talk to him as one. Here they were always moving.

Andretta: [Unintelligible]. If ever you send me to see him it's coming from you it's that right, right now he thinks I'm in a [Unintelligible].

Ianiello: No, no I'll send word to Mike you're the one that's gonna join the pool with Jimmy now, in about six months you'll get.

Andretta: I can see Mike any time you want me to.

Ianiello: You?

Andretta: Yeah.

Ianiello: That's good. I'll tell you why, because, you know, I'll send Jimmy. I'll explain the problem.

Agent William Nugent, a special agent of the Department of Labor and a government witness at trial, testified that Jimmy Ida was Ianiello's driver and that organized crime figures often conveyed messages through such underlings. Sciarra admitted at trial to meeting with Jimmy Ida six or seven times between 1987 and 1989. Additionally, surveillance revealed that Sciarra had one direct meeting with Stephen Andretta in 1989.

There was, however, even more damning evidence in the intercepted wire conversations. In the December 7, 1984 conversation between Ianiello and Andretta, the following exchange took place:

Andretta: I understand at this point. But with Mikey and then you, you have direct control of Mikey.

Ianiello: Yeah.

Andretta: No question.

Ianiello: Yeah he does what I tell him.

The district court concluded from these and the other taped conversations between

members of the Genovese Family that the Family was attempting to retain control over Local 560:

> The tapes constitute strong evidence that ... control was to be exercised through Anthony Salerno's caporegime Matthew Ianiello and that Ianiello, upon the advice of Stephen Andretta, selected Michael Sciarra to be the man on the scene at Local 560 to whom orders and instructions could be given.

*Local 560*, 694 F.Supp. at 1178.

Sciarra urges, however, that the tapes in fact demonstrated that the Genovese Family was having difficulty controlling him in his conduct of Local 560. During the December 7, 1984 conversation between Andretta and Ianiello, Andretta said, "I don't think Mikey's calling the right shots, I'll be honest with you." That statement in isolation would appear to indicate that the Genovese Family had no control over Sciarra. The conversation in its entirety, however, reveals that Andretta and Ianiello were attempting to establish regular communications with Sciarra in order to control the affairs of Local 560 more closely. Therefore, the statement, if anything, further supports the conclusion that the Genovese Family controlled Sciarra.

Sciarra correctly asserts that his own conversations were never recorded on the tapes. Nevertheless, his meetings with Ida precisely conformed to behavior described on the tapes, which lends support to the tapes' credibility. Further, as we will see, his dealings with NEMF were exactly as described on the tapes. Therefore, we agree with the district court that Sciarra's meetings with Ida and Andretta, as described on the tapes, as well as the other conversations on the tape, are, in the context of the full record in this case, from 1982 until the present, highly suggestive of a corrupt link between Genovese Family members and Sciarra.

### 2. The New England Motor Freight "Sweetheart" Deal

In addition to the direct evidence of control provided by the tapes, the district court relied on circumstantial evidence relating to Sciarra's conduct while he was acting president of Local 560. As we have detailed, see pages 325–26, the district court found that Sciarra attempted to preserve the pre-existing "sweetheart" relationship between NEMF and Local 560 by sending a proposed collective bargaining contract to NEMF in 1985 that contained terms favorable to NEMF and unfavorable to Local 560. Additionally, the district court found that Sciarra directed Frank Rubino, Local 560's business agent for NEMF, to alter his testimony in grievance proceedings against NEMF in order to favor NEMF. Based on this circumstantial evidence, and on taped conversations between Ianiello and Andretta in which Ianiello suggested that Sciarra "square" Local 560's relationship with NEMF, the district court concluded that Sciarra was still serving the Genovese Family's interests with regard to NEMF after the first injunction.

■ Sciarra raises a number of objections to the district court's findings with regard to NEMF. First, he argues that there was no direct evidence of communication between Genovese Family members and Sciarra about the NEMF deal. Therefore, he contends, there is insufficient evidence to conclude that he was serving the Genovese Family's interests in conducting Local 560's dealings with NEMF. We disagree. If the district court was correct that Sciarra's conduct was objectively unfavorable to Local 560's membership, and members of the Genovese Family were discussing in detail how to control Sciarra with regard to NEMF, that is sufficient circumstantial evidence on the full record in this case, which details the lengthy pattern of corruption in Local 560, to support the conclusion by a preponderance of the evidence of Genovese Family control.

■ Second, relying largely on his own trial testimony, Sciarra argues that the 1985 NEMF contract was not, in actuality, a sweetheart deal because, among other things, it was merely an effort by the union to get its "foot in the door" at NEMF. In other words, Sciarra argues that the proposed agreement was designed to re-establish a solid base of Local 560 employees at

NEMF. The district court, to which we owe deference on matters of credibility, chose to reject Sciarra's testimony, and the court's conclusion that the contract was a sweetheart deal is amply supported. The most notable example of the contract's glaring disadvantage for Local 560's membership is the undisputed fact that the contract itself does not require Local 560's warehousemen to be covered by the National Master Freight Agreement, but rather burdens them with less favorable contract terms. That fact alone objectively demonstrates an attempt on Sciarra's part to preserve the corrupt relationship between NEMF and the leadership of Local 560. In essence, Sciarra's argument is an effort to relitigate factual matters with regard to which the district court, the arbiter of the facts, has already reached a supportable conclusion.

 Third, noting that NEMF initially refused to sign the contract that he sent in January 1985, Sciarra argues that it follows that the contract was not favorable to NEMF. There are, however, numerous reasons why NEMF might have initially refused to sign the agreement, including that it wanted terms even more favorable to itself. Whatever NEMF's motive, the fact that the terms of the contract were objectively unfavorable to the membership of Local 560 is sufficient to support the conclusion that Sciarra was attempting to protect members of the Genovese Family from having their past misdeeds revealed and that he was attempting to preserve the corrupt relationship between NEMF and Local 560.

In sum, the district court's findings with regard to NEMF were amply supported both in that the 1985 contract was unfavorable towards the membership of Local 560 and in that Sciarra influenced Rubino to alter his testimony. These facts suggest that Sciarra was serving the Genovese Family's interests. We therefore hold that the district court's conclusion that Sciarra was controlled by the Genovese Family in his conduct of Local 560's affairs with regard to NEMF was supported by the evidence.

### 3. Sciarra's Retention of Corrupt Benefit Providers

 The district court also based its conclusions on Sciarra's management decisions with regard to various employee plans. Specifically, the court concluded that the appointment of Marvin Zalk as an administrator of certain welfare plans demonstrated a continuing pattern of corruption.[11]

The district court had found in the initial proceedings that Marvin Zalk had long been affiliated with the Provenzano Group's corrupt conduct of Local 560. See *Local 560*, 581 F.Supp. at 304; *Local 560*, 694 F.Supp. at 1181–82. In addition, Zalk was convicted of obstruction of justice in regard to a case involving fraud upon the Local 560 Dental Plan. Nevertheless, after entry of the initial injunction, Sciarra retained Zalk as an administrator of several Local 560 Welfare Plans. The district court's conclusion that this demonstrates ongoing Genovese Family influence over Sciarra and Local 560 is supported by these undisputed facts.[12]

---

**11.** In addition to the evidence about Zalk, the district court also relied on evidence about the appointment of Thomas DiBiasi's law firm as the provider of legal services to union members to justify the new injunction. As we have explained, Sciarra retained the law firm of Citrino, Balsam, and DiBiasi as the legal services provider for Local 560's membership despite DiBiasi's failure to account for funds paid to him by Local 560 and despite DiBiasi's suspension from the practice of law. Although we agree that the retention of the DiBiasi firm demonstrates ongoing corruption, nothing in the record directly links DiBiasi and the Genovese Family. We therefore conclude that the DiBiasi incident, while probative of ongoing corruption in Local 560, does not, in and of itself, demonstrate continued Genovese Family control.

**12.** Sciarra's argument that he was merely one voting trustee among six in the decision to retain Zalk, while true, is unpersuasive given that 1) Sciarra likely had the capacity to influence how other trustees voted, see 754 F.Supp. at 407; and 2) the cooperation of other trustees in voting to retain a corrupt administrator is consistent with the inference of Genovese Family influence over Sciarra's votes. It simply suggests that Genovese Family influence may extend beyond Sciarra.

#### 4. Sciarra's Influence Over Local 560 in 1989 and 1990

Most of the evidence detailed thus far relates to Sciarra's activities while he was serving as president of Local 560. The district court also found, however, that even when Sciarra is not serving as an officer, he still exercises de facto control over Local 560 and still uses his control to press the Genovese Family's agenda. The court found that when Sciarra served as business agent for Local 560, he was able to influence the affairs of Local 560. The court's finding was amply supported. Videotapes of union meetings, detailed in the district court's opinion, see *Local 560*, 736 F.Supp. at 606–10, show Sciarra effectively running the meetings. Union newsletters devote a great deal of coverage to Sciarra's activities. See id. at 610. Even when Sciarra was only a rank-and-file union member, he exercised great influence at the meetings. See *Local 560*, 754 F.Supp. at 405 (finding that Sciarra exercised influence "whatever his title"). Additionally, a government agent observed Sciarra, at a time when he had no title, demand that he be let into a fund board meeting, presumably for the purpose of directing it. See *Local 560*, 754 F.Supp. at 405–06.

Not only did evidence demonstrate that Sciarra was controlling Local 560, but it also demonstrated that he was using the local for the purposes of the Genovese Family. As background, we note that the 1984 tapes of conversations between Ianiello and Andretta reveal that the two men planned to use Jimmy Ida, Ianiello's chauffeur, as a messenger from the Genovese Family to Sciarra. Sciarra admitted on cross-examination in the district court that he had met with Ida on seven occasions between 1987 and 1989. Although Sciarra denied that the purpose of the meetings was to discuss Local 560, the district court found that the evidence "[a]t the very least ... shows Sciarra's continuing association with the Genovese Family members who devised the plan to exercise control of Local 560 through him." Id. at 406.

Additionally, in 1990, Sciarra met directly with Stephen Andretta, a caporegime in the Genovese Family. Again, Sciarra denied that these meetings related to the conduct of Local 560's affairs, but the district court specifically expressed its disbelief of that testimony. The court found that this meeting showed contact between the Genovese Family and Sciarra that jeopardized the work that the trustee had done to create a corruption-free environment in Local 560.

#### 5. Summary

We hold that this evidence was sufficient to support the injunction issued by the district court. We note that to receive the relief that it requested, the government was only required to show by a preponderance of the evidence that Sciarra's activities were frustrating the purposes of the 1984 injunction. Our review of the district court's factual findings is highly deferential, and they will be disturbed only upon a finding that they are clearly erroneous. See *Goldberg*, 932 F.2d at 277. Further, our review of the district court's decision to modify its injunction is for an abuse of discretion. See *Mayberry v. Maroney*, 558 F.2d 1159, 1163 (3d Cir. 1977). See also *Ruiz v. Lynaugh*, 811 F.2d 856, 860 (5th Cir.1987).

Although Sciarra has strongly contested the government's contentions both in the district court and here, we believe that the government carried its burden for several reasons. Initially, we note that, on appeal, Sciarra barely disputes that he was the de facto president of Local 560. Therefore, there is no question that if he is corrupt, his influence over the local could completely destroy the work of the trusteeship.

Sciarra does, however, dispute the premise that he has engaged in corrupt activities since the initial injunction. He argues that his contacts with the Genovese Family were intermittent and that there is no evidence that meetings between him and Andretta and him and Ida concerned Local 560. But the district court specifically found Sciarra's testimony on that point incredible. Further, the meetings with Ida conformed precisely to the manner in which Ianiello and Andretta described how they would contact Sciarra regarding Local 560.

However, even if Sciarra's meetings with Ida and Andretta were not specifically to discuss matters related to Local 560, the mere contact with Genovese Family members might be sufficient to endanger the work of the Local 560 trusteeship through subtle influence over Sciarra, who in turn wields great influence in the local. Thus, the direct evidence linking Sciarra to the Genovese Family throughout the 1980s, although not overwhelming, is sufficient to contribute to a discretionary finding that the purposes of the injunction were being frustrated.

In addition to the direct evidence of contact between Sciarra and Genovese Family members, the tapes also support the district court's conclusion that modification of the initial injunction was necessary. After the district court had taken its first step to undo the corrupt conduct of Local 560's affairs, members of the Genovese Family were nevertheless plotting to retain influence over the local. The district court's findings of fact, which were not clearly erroneous, establish that the Genovese Family's method of controlling the union's affairs was through Sciarra. Although Sciarra's own words were not recorded, the court found that the tapes nevertheless showed the continued influence of the Genovese Family. That finding is another factor justifying the court's discretionary decision in favor of modification.

Further, we cannot ignore what Sciarra did when he was in a position to influence the affairs of Local 560 as established by the district court's non-clearly erroneous findings of fact. By continuing and perpetuating the corrupt relationship with NEMF and by reappointing an individual long linked to the Genovese Family to a position of influence in the Local 560 benefit funds, Sciarra demonstrated that he still retained the attitude and disposition that led Local 560 into corruption.

In sum, there was sufficient evidence to find that Sciarra's current activities threat-

ened the purposes of the first injunction. The district court did not, therefore, abuse its discretion in deciding to modify the initial injunction.

## IV. ADMISSIBILITY OF THE IANIELLO/ANDRETTA TAPES AGAINST SCIARRA

The government concedes that the tapes of various conversations admitted in the district court against Sciarra were hearsay. Nevertheless, the government contends that the tapes were properly admitted under the exception for co-conspirators statements, FRE 801(d)(2)(E).[13] Sciarra responds that the tapes were improperly admitted. If Sciarra were correct, it would undermine the findings of fact that we have relied upon in determining that there was no abuse of discretion in the modification of the injunction.

In order for a statement to be admitted under Rule 801(d)(2)(E), "[t]here must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.'" *Bourjaily v. United States*, 483 U.S. 171, 173, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987). See also *United ed States v. Gambino*, 926 F.2d 1355, 1361 (3d Cir.1991). The offering party must prove both of these facts by a preponderance of the evidence. See *Bourjaily*, 483 U.S. at 173–75, 107 S.Ct. at 2778–79. We review the district court's decisions with regard to the admission of evidence for abuse of discretion. See *In re Japanese Electronics*, 723 F.2d 238, 260 (3d Cir. 1983), rev'd on other grounds, *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Sciarra contends that the district court made no finding by a preponderance of the evidence that he was conspiring with the individuals speaking on the tapes (i.e., Ianiello, Andretta, Jaronko, and Salerno) and

---

**13.** FRE 801(d)(2)(E) provides:

A statement is not hearsay if—
. . . .

(2) . . . The statement is offered against a party and is . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

that, at all events, the evidence would not support such a finding. He also argues that, even if a conspiracy existed at one time, the statements were made after termination of the conspiracy. He therefore submits that admission of the tapes was an abuse of discretion and was prejudicial, requiring that we vacate the injunction.

### A. *Were Sciarra and the Genovese Family Members Co–Conspirators?*

In deciding whether to admit the tapes both at the preliminary hearing and at the trial, the district court assumed that there had been a finding before issuance of the first injunction that Sciarra was involved in a conspiracy with members of the Genovese Family, including those individuals whose conversations were recorded on the tapes. The court concluded that "for evidential purposes, Sciarra was treated by Judge Ackerman and by the Third Circuit as a co-conspirator." *Local 560*, 754 F.Supp. at 402. Sciarra argues that no such finding was ever made and that the district court therefore erred in determining that he was a co-conspirator with various members of the Genovese Family.

Sciarra is simply incorrect in asserting that no finding that a conspiracy between the declarants and himself existed was ever made. In affirming the district court's grant of the initial injunction, we specifically stated that "the district court found ... that the Executive Board defendants [including Sciarra] violated § 1962(b) and *conspired* to violate § 1962(b) in contravention of § 1962(d)." See *Local 560*, 780 F.2d at 294 n. 35. Therefore, we have already determined that, in the 1984 proceeding, the district court did make a finding, by a preponderance of the evidence, that there was a conspiracy in which Sciarra and the declarants, Ianiello and Andretta, participated prior to 1984.

The court's 1984 finding that Sciarra was a co-conspirator with the individuals whose conversations are recorded on the tape was amply supported by the evidence detailed in its opinion. See *Local 560*, 581 F.Supp. at 325, 336. Ianiello was not only a captain or caporegime in the Genovese Family, but he was also found to have been instrumental in directing the affairs of Local 560 for the benefit of the Family, with the assistance of Sciarra. See id. at 305–06. Stephen Andretta, an officer and employee of Local 560 for much of the time leading up to the 1984 injunction, conspired with Sciarra and others to violate numerous laws, including laws prohibiting taking bribes for labor peace and accepting kickbacks. See id. at 309–11. We are therefore left to decide only whether the particular statements made on the tapes, which were admitted against Sciarra, were made during the course of the conspiracy.

### B. *Were the Statements Made During the Course of the Conspiracy?*

Sciarra asserts that even if a conspiracy were found to have existed in 1984 or earlier, the conspiracy terminated with the issuance of the first injunction. According to this argument, when Sciarra was barred from holding a position of trust in Local 560, he could no longer continue to conspire with members of the Genovese Family to control the affairs of Local 560. In effect, Sciarra argues that his forced retirement from Local 560 necessarily led to his forced retirement from the conspiracy.

■■■ Once the government had established that Sciarra was involved in a conspiracy with members of the Genovese Family, the district court was entitled to presume that the conspiracy continued until Sciarra proved its termination. See *United States v. Janotti*, 729 F.2d 213, 221 (3d Cir.1984). Once Sciarra had provided sufficient evidence to establish a prima facie case of his withdrawal, the government was required to "rebut the prima facie showing either by impeaching the defendant's proof or by going forward with evidence of some conduct in furtherance of the conspiracy subsequent to the act of withdrawal." *United States v. Steele*, 685 F.2d 793, 804 (3d Cir.1982).

■■■ Sciarra contends that his participation in the conspiracy terminated when the court-ordered injunction banned him in 1986 from holding a position of trust in Local 560. Sciarra submits that he was, by

analogy, "imprisoned" by the injunction and that it prevented him from continuing to participate in the conspiracy. In formulating this argument, Sciarra relies on *Steele*, 685 F.2d at 793. In *Steele*, an employee of General Electric, Robert Naples, was part of a conspiracy involving bribes of public officials in Puerto Rico. Naples argued that he could not be prosecuted because he had withdrawn from the conspiracy more than five years before his indictment and that, therefore, the statute of limitations for conspiracy had run. We determined that Naples had indeed withdrawn from the conspiracy because he had resigned from his position with General Electric and that this evidenced an unwillingness on his part to continue in General Electric's conspiracy. We therefore ordered that a judgment of acquittal be entered on his behalf because the statute of limitations had run.

*Steele* is inapposite for two reasons. First, all the recorded conversations admitted against Sciarra took place before the injunction against Sciarra was entered in 1986. Therefore, even were we to accept Sciarra's argument that he was removed from the conspiracy by the injunction, the relevant co-conspirators' statements were made before his removal from the conspiracy. Second, in *Steele*, the government failed to rebut the prima facie case of withdrawal that Naples made. Here, as we have discussed, the government presented ample evidence that, despite the restrictions placed on Sciarra, he retained great influence over the conduct of Local 560 affairs and conspiratorial ties to the Genovese Family. The influence that he retained at Local 560 meetings, as demonstrated by his conduct on the videotapes of those meetings, shows his power in the local. His 1987–90 meetings with Andretta and Ida, members of the Genovese Family, show that he was still under Genovese Family influence.

Therefore, while Sciarra may have made a prima facie case of withdrawal, the government provided more than sufficient evidence to rebut it. The district court did not abuse its discretion in finding that issuance of the injunction did not terminate the conspiracy or Sciarra's participation in it and did not err in admitting the tapes.

## V. LOCAL 560'S STANDING TO OBJECT TO THE INJUNCTION

In addition to Sciarra's objections to the injunction, which we have rejected, Local 560 raises numerous objections of its own: that the injunction infringes its members' rights to First Amendment association; that the injunction infringes on Local 560 membership's rights under the Labor Management Reporting and Disclosure Act (LMRDA), see 29 U.S.C.A. §§ 401 to 531 (West, 1985 and 1992 Supp); and that RICO does not authorize the issuance of such an injunction. Before considering those arguments, we must first determine an important preliminary question—whether Local 560 has standing to object to the issuance of an injunction against Sciarra.

### A. *Overview of Organizational Standing*

■ Local 560 appeals on behalf of its membership asserting that various constitutional and statutory rights of its members are violated by the relief entered against Sciarra. Local 560 does not assert its own rights as an institution, but rather asserts the rights of its individual members. Hence, we must determine whether Local 560 has standing as an organization to assert its members' rights. See, for example, *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 39–45, 96 S.Ct. 1917, 1925–28, 48 L.Ed.2d 450 (1976); *Warth v. Seldin* 422 U.S. 490, 509–17, 95 S.Ct. 2197, 2211–15, 45 L.Ed.2d 343 (1975).

In *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Supreme Court established a three-pronged test for determining whether an organization may sue in a representative capacity on behalf of its membership. An organization only has standing if:

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are ger-

mane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

432 U.S. at 342, 97 S.Ct. at 2441. Applying this test in *Hunt*, the Supreme Court granted standing to an agency established to promote and protect the state's apple industry in a suit where the agency sought to challenge regulations of the apple industry.

The government argues that Local 560 lacks standing to bring this appeal under the first two prongs of the *Hunt* test. The government argues that the injury to the members themselves is too "conjectural" and that the organization cannot therefore bring a suit on behalf of its members. See *City of Los Angeles v. Lyons*, 461 U.S. 95, 107, 103 S.Ct. 1660, 1668, 75 L.Ed.2d 675 (1983). The government further argues that the interests that Local 560 seeks to protect on this appeal are not germane to the local's organizational purpose. Therefore, according to the government, Local 560 cannot assert those rights on behalf of its membership. We consider these arguments separately.

### B. *Concrete Injury*

The government argues that the injunction will *benefit* the union's members by removing the intimidating and corrupt influences that have inhibited Local 560 members in the exercise of their First Amendment and LMRDA rights. Therefore, according to the government, members of the union are suffering no palpable injury as a result of the injunction, and they would not, as individuals, have standing to sue in their own right. Consequently, the government argues, Local 560 does not have standing to bring suit on their behalf.

In support of this argument, the government cites to our previous opinion in *Local 560*, 780 F.2d at 296 n. 39, wherein we held "that the membership of Local 560 ... is not being punished by the district court's injunction[.] ... [T]he district court was therefore protecting rather than forfeiting the members' rights." The government argues that the present injunction is merely a renewed effort to protect further the rights of the Local 560 membership.

The government's argument misapprehends what is required to demonstrate *standing*. Essentially, the government converts the standing inquiry into a utilitarian calculation of whether the governmental restriction is, on balance, good for the plaintiff. That is not the purpose of the standing requirement. While, on the merits, the injunction granted by the district court may be justified as a narrowly tailored means of achieving a compelling governmental interest or may fail that test, all a litigant must do to demonstrate *standing* is "*allege* personal injury fairly traceable to the ... allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (emphasis added). Here, Local 560, one of the defendants in an action brought by the government, objects to the relief fashioned by the district court and argues that, in restricting the membership from interacting with one of their fellow members, the injunction deprives the individual members of protected rights to associate. This result, the local says, is directly traceable to the government's legal action. That is a sufficient allegation to establish standing. If we were to accept the government's argument, it would require us to evaluate the merits of every action before we determine whether a litigant has standing to raise the claim. Those inquiries are separate, however, and we will treat them as such in this case.

The government further argues that the injury to plaintiffs is too "hypothetical" because there has been no showing that Sciarra was about to associate with the union membership on whose behalf the suit is being brought. The record belies the government's argument. Sciarra has continually been present at Local 560 meetings and has spoken at and, indeed, dominated almost all of them. See *Local 560*, 736 F.Supp. at 607–10. Additionally, evidence presented in the district court proved that

he has been intimately involved in the running of Local 560's affairs. See id. at 606–7. All of these activities are associational activities, and they are highly likely to continue in the absence of an injunction. Therefore, the injunction will undoubtedly infringe on associational activities.

The government's argument is further undermined by the very fact that the government brought this action for injunctive relief, alleging that Sciarra's repeated, imminent contacts with union members would lead to further RICO violations or corruption of the union. If the government is correct that Sciarra must be enjoined because further contacts between him and union members are imminent and potentially dangerous, the government's own contention establishes that the injury is more than merely hypothetical. See *Blum v. Yaretsky,* 457 U.S. 991, 1000, 102 S.Ct. 2777, 2784, 73 L.Ed.2d 534 (1982) ("[O]ne does not have to await the consummation of threatened injury to obtain preventive relief.") (citations omitted).[14]

#### C. *Relationship to Organizational Purpose*

The government also contends that Local 560 fails to satisfy the second prong of the *Hunt* test, which requires that "the interests [the organization] seeks to protect are germane to the organization's purpose...." See *Hunt,* 432 U.S. at 344, 97 S.Ct. at 2441. Because Local 560 does not have as its purpose the protection of the rights of Sciarra, who has been found to have violated 18 U.S.C. § 1962(b) and (d), the government contends that Local 560 lacks standing. See *Local 186,* 812 F.2d at 1239. In this respect, the government notes that "[i]t is the stated policy of the [International Brotherhood of Teamsters]

to be free of the influence of organized crime." *United States v. International Brotherhood of Teamsters,* 745 F.Supp. 908, 912 (SDNY 1990). If freedom from organized crime is among the local's purposes, says the government, then the local has no interest in protecting an individual found to have played a role in securing a role for organized crime.

The government's argument mischaracterizes Local 560's role in objecting to the injunction, and it misapprehends the role of standing doctrine in this context. Local 560 objects to the injunction not because it seeks to protect the rights of Sciarra, but rather on the ground that the First Amendment and LMRDA rights of its members are infringed because the injunction prohibits members from associating with Sciarra. Local 560, like most unions, has a legitimate organizational interest in protecting these rights on behalf of its members. See *Hotel & Restaurant Employees & Bartenders Int'l v. Read,* 832 F.2d 263, 265 (3d Cir.1987) (allowing union to bring First Amendment association claim on behalf of its membership despite rejecting claim on the merits). See generally *Brotherhood of R.R. Trainmen v. Virginia ex rel Virginia State Bar,* 377 U.S. 1, 4, 84 S.Ct. 1113, 1116, 12 L.Ed.2d 89 (1964) ("[T]he right of the workers personally or through a special department of their [union] to advise ... is an inseparable part of this constitutionally guaranteed right to advise and assist each other."). That fact alone is sufficient to persuade us that the union has standing to bring suit on behalf of its members.

Local 560's role in protecting the associational rights of its members is further evidenced by the very fact that the government itself named Local 560 as a defendant in this suit. The decision to do so suggests

---

**14.** In pressing its argument, the government relies on *Local 186, IBT v. Brock,* 812 F.2d 1235 (9th Cir.1987). In *Local 186,* a union official had been disqualified pursuant to 29 U.S.C.A. § 504 (West, 1985) from holding office in the local after he was convicted for various crimes under 18 U.S.C. § 1962(d). The union sought a declaratory judgment that § 504 was unconstitutional alleging that (1) it was an ex post facto law punishing the official, (2) it denied due process, (3) it violated the equal protection clause by only punishing felons, and (4) it de-

prived the local of its property without due process. The court held that Local 186 lacked standing to raise those challenges. That case is inapposite here because Local 186 did not "allege nor ... argue that its members somehow [were] injured because § 504 deprive[d] them of the services of [the official]." Id at 1237. Instead, Local 186 raised a series of issues relating to the statute as it applied to the official and to the statute's rationality, not to the members of the union as a whole. We therefore find *Local 186* unhelpful in deciding the present appeal.

that the union plays a key role in asserting and protecting the associational rights of its members. The government's standing argument thus belies the manner in which it has proceeded with this litigation. Crucial to the government's argument is that the association between Sciarra and members of Local 560, in their capacity as members of that organization, has led to violations of 18 U.S.C.A. § 1962(b) and (d). The government has hence sought to sever ties between Sciarra and Local 560's membership. Now, when Local 560 objects to that injunction on behalf of its membership, the government claims that the organization lacks standing. We do not believe that the government can impose restrictions on the associational rights of the membership without being required to defend against the constitutional arguments of those members.

 Although the government may prove, on the merits, that the injunction does not impermissibly infringe on protected associational rights, we believe that Local 560 has the right to assert those rights on behalf of its members when it asserts that the injunction interferes with those rights. We therefore hold that the objections that Local 560 raises to the injunction are germane to Local 560's organizational purpose.[15] The local thus has organizational standing to object to entry of the injunction against Sciarra.

## VI. LOCAL 560'S FIRST AMENDMENT OBJECTIONS TO THE INJUNCTION

### A. *Introduction*

Local 560 raises a First Amendment challenge to the issuance of the injunction against Sciarra. The local argues that the injunction, in restricting the speech rights of its members in a content-based manner, does not further a compelling governmental interest. The essence of Local 560's argument in this respect is that the record was not adequate to support a finding that a climate of intimidation exists in Local 560 and thus to justify restrictions on Sciarra. Local 560 also contends that, even if a compelling governmental interest exists, the injunction is not sufficiently narrowly tailored to further that interest. In sum, the local argues that the injunction prohibits protected speech and is therefore invalid.

### B. *Does the Injunction Violate Local 560's Members' Associational Rights?*

 The injunction issued against Sciarra undoubtedly will affect—and, indeed, is aimed at affecting—the associational capacity of Local 560's membership. The injunction prohibits Sciarra from holding an office or position of trust in the union, from attending or participating in membership meetings, from participating in any rallies related to the affairs of Local 560, from otherwise attempting to influence Local 560 or its benefit plans, and from visiting the local's union hall except under certain restricted conditions. The injunction plainly aims at preventing Local 560's membership from receiving certain types of information from Sciarra and, indeed, from associating with him, and the injunction's wide-ranging prohibitions will no doubt accomplish that end.

---

**15.** The government also argues in passing that Local 560 does not satisfy the third prong of *Hunt*, which prevents an organization from bringing suit on behalf of its members if joinder of individual members would be necessary. The crux of the government's argument is that members of Local 560 disagree as to whether barring Sciarra from the local's activities is a good idea. That argument is fallacious for several reasons. First, the government has made no showing that the ideas and interests of the membership of Local 560 are in conflict. Second, we do not believe the conflict that the government purports to demonstrate would destroy standing for the union. If the injunction

impermissibly infringes on the First Amendment and LMRDA rights of Local 560's membership, then the rights of all members are violated regardless of whether they would choose to pursue those rights individually or not. Their interests with respect to First Amendment and LMRDA rights are identical. Third, we do not believe that the presence of some conflict among members of an organization should necessarily lead to the denial of standing to the organization. See *National Maritime Union of America v. Commander, Military Sealift Command,* 824 F.2d 1228, 1234 (DC Cir.1987) (granting organizational standing to unions so long as individual members would have standing).

The injunction therefore presumptively abridges the association rights of Local 560's membership by specifically limiting the *kind* of information they can receive, see generally *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 1826, 48 L.Ed.2d 346 (1976) (finding presumptive abridgment of speech where statute singled out for suppression information about drug prices); *Brandenburg v. Ohio,* 395 U.S. 444, 447–49, 89 S.Ct. 1827, 1830–31, 23 L.Ed.2d 430 (1969) (finding presumptive abridgement of speech where statute made illegal the advocacy of a particular political doctrine). The injunction also limits the individuals with whom the members can associate. Such restrictions presumptively violate the First Amendment. See *Simon & Schuster, Inc. v. Members of the New York Crime Victims Board,* —— U.S. ——, ——, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991). To justify such an abridgement, the government must demonstrate that the restriction serves a "compelling" governmental interest and that it is narrowly tailored to further that interest. See id; *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 784–85, 98 S.Ct. 1407, 1420–21, 55 L.Ed.2d 707 (1978).

### 1. Is There a Compelling Governmental Interest?

The government urges that the compelling governmental interest at stake here is the eradication of organized crime. We recognize, as numerous courts have before us, that the eradication of organized crime from labor unions is, indeed, a compelling governmental interest. See, for example, *Brown v. Hotel & Restaurant Employees Int'l Union Local 54,* 468 U.S. 491, 508, 104 S.Ct. 3179, 3189, 82 L.Ed.2d 373 (1984); *United States v. International Brotherhood of Teamsters,* 941 F.2d 1292 (2d Cir.1991). Local 560 does not quarrel with that fact on this appeal. Rather, the local argues that the government has failed to demonstrate that the interest of eradicating organized crime is, in fact, at stake in this case. It notes that before the district court granted the injunctive relief the government seeks to protect on this appeal,

Local 560 was able to conduct two fully fair and free elections and asserts that the climate of intimidation that characterized the local in 1984 has largely dissipated. Because the district court did not, during this phase of the litigation, make a finding that the climate of intimidation persisted, Local 560 argues that the governmental interest in eradicating organized crime is absent.

We disagree. Although the less severe restrictions imposed earlier on Sciarra were temporarily sufficient to facilitate an environment in which fair and free elections could be conducted, the district court's factual findings are adequate to support the conclusion that *any* current effort on the part of Sciarra to influence Local 560's affairs would increase the risk that the local would be returned to the control of the Genovese Family. As we have discussed, the district court found that Sciarra has consistently used whatever influence he has to advance the Genovese Family's interests. See page ——. During the period of 1984 to 1986, when Sciarra was local president, he used his authority to protect various arrangements that were designed to serve the Genovese Family's interests, including the NEMF scheme and the appointment of a corrupt official to a position of trust in the union's benefit funds.

Further, the court found that Sciarra met with members of the Genovese Family during 1988 and 1989, and it drew the supportable inference that those meetings concerned how the Genovese Family could reassert control over Local 560. Finally, the district court found that Sciarra will manipulate Local 560 to serve the interests of the Genovese Family "[a]s long as [he] holds any position within Local 560" and that he will "dominate and control the Local." *Local 560,* 736 F.Supp. at 612.

All of these findings, which we have found are supported, suggest that so long as Sciarra plays any role in the union, he will use that influence to see that the interests of the Genovese organized crime family are advanced. Further, Local 560's association with Sciarra is what allows organized crime to continue its grip on the local.

Therefore, the government has demonstrated that the compelling governmental interest of eradicating organized crime from labor justifies the abridgement of the members of Local 560's right to associate with Sciarra.

### 2. Is The Injunction Sufficiently Narrowly Tailored?

 Local 560 argues that even if a compelling governmental interest is at stake, the injunction issued by the district court is not sufficiently narrowly tailored to advance that interest.[16] See *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 636, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980) (striking down a content-based restriction on door-to-door solicitation because restriction was not sufficiently narrowly tailored). On its face, the injunction prohibits not only unlawful efforts on the part of Sciarra to influence the membership and solidify organized crime control of the local, but *any* advice from Sciarra to the union about how to conduct union affairs. Local 560 argues that a more narrow injunction—one that, for example, only forbade Sciarra from associating with organized crime figures— would advance the government's interest in eradicating organized crime from Local 560 equally well, and that this injunction therefore contravenes the First Amendment.

#### a. Ban on Officeholding

 To consider whether the restrictions imposed on Sciarra are sufficiently narrowly tailored to survive First Amendment scrutiny, we must examine the specific restrictions imposed by the injunction. Initially, the injunction bans Sciarra from holding any office or position of trust within the union. This associational restriction is justified by the facts found by the district court. When Sciarra was president of the local, he used his authority to preserve the corrupt relationship between Local 560 and NEMF. Further, in his more recent capacity as business agent, he made contacts with Genovese Family members, while simultaneously exercising influence over the affairs of the union. The district court drew the reasonable inference from these facts that Sciarra would use any position of influence in Local 560 to return it to the control of organized crime. We have previously upheld prohibitions on officeholding against other individuals who endeavored to bring Local 560 to corrupt ends, see *Local 560*, 780 F.2d at 295, and we have no difficulty doing so here where, as we have explained, the record supports the inference that any position of trust will be abused to allow for organized crime influence.

#### b. Other Restrictions of the Injunction

 The injunction also prohibits Sciarra from attending or participating in any rallies related to the affairs of Local 560 and from attempting to influence the affairs of Local 560 in any way. Consequently, the membership will be deprived of the ability to associate with Sciarra for the purposes of consulting on union business. See *Brotherhood of R.R. Trainmen*, 377 U.S. at 4, 84 S.Ct. at 1116. Local 560 notes that the injunction prohibits *all* association between Sciarra and Local 560's membership, including association that has nothing to do with securing organized crime influence over the local. The local argues that this necessarily demonstrates that the injunction is not narrowly tailored to further the governmental interest in

---

**16.** In formulating its First Amendment argument, Local 560 asserts that the injunction is "overbroad." Overbreadth doctrine, however, applies only in cases involving facial challenges to a statute that penalizes protected as well as unprotected speech. See, for example, *Board of Airport Commissioners v. Jews for Jesus*, 482 U.S. 569, 574, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987) (facially invalidating statute that prohibited all expressive activity in a public airport). Courts will invalidate a statute as over-broad "because it also threatens others not before the court." See *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). Here, however, where an injunction has been issued against an individual, there is no threat of chilling others not before the court, and overbreadth doctrine is irrelevant. We will consider Local 560's arguments in this regard as an argument that the injunction is not sufficiently narrowly tailored to satisfy the First Amendment.

combatting organized crime's influence in organized labor.

Although the Constitution undoubtedly protects freedom of association as a right supportive of the exercise of other rights, see *Griswold v. Connecticut,* 381 U.S. 479, 482, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965), the right to associate, even for legitimate ends, has never been held to be absolute. See *United States Civil Service Commission v. National Association of Letter Carriers, AFL–CIO,* 413 U.S. 548, 566, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796 (1973). We must therefore decide whether an injunction forbidding all associational contact between the membership of a local and one of its members is permissible when some, but not all, of that contact would be for the illegitimate end of advancing organized crime's control over the local.

In analyzing this question, we note that courts have previously upheld as constitutional such broad prohibitions against association between corrupt union officials and the membership of their union, even though the prohibitions encompass some associational activity unrelated to organized crime. In *United States v. International Brotherhood of Teamsters,* 941 F.2d 1292 (2d Cir.1991), the court upheld the expulsion of union members from a local by a court-appointed independent administrator, reasoning that such a prohibition, following a finding that the members had been affiliated with organized crime members, did not violate the expelled members' rights to freedom of association. The court explained that the threat of corruption and organized crime influence justified such a prohibition:

> [I]t is well-established that an individual's right to freedom of association may be curtailed to further significant governmental interests. Because the public has a compelling interest in eliminating the public evils of crime, corruption, and racketeering in union activity, the independent administrator was fully justified in sanctioning [the members] for their knowing association with organized crime here.

941 F.2d at 1297 (citations omitted). In upholding such a prohibition, the court permitted a ban on both legitimate and illegitimate association between the expelled members and the membership, and held that the governmental interest in purging organized crime from labor unions was adequate to justify such a broad prohibition.

In *Hotel & Restaurant Employees & Bartenders v. Read,* 597 F.Supp. 1431 (DNJ 1984), the court refused to grant a preliminary injunction to members of a union against the State of New Jersey's prohibition of those members' belonging to the union because the members had links to organized crime. The court held that New Jersey's restrictions on those members' rights to belong to the union did not violate their rights to freedom of association because "non-innocent association with criminals may not be afforded protection under the First Amendment." See 597 F.Supp. at 1448.

We find the constitutional analysis in *International Brotherhood of Teamsters* and in *Read* persuasive here, and conclude that the injunction in this case is sufficiently narrowly tailored to pass constitutional scrutiny. As we have detailed, Sciarra used any influence he could muster to bring Local 560 under the control of organized crime. Hence, the less restrictive measures that have been imposed upon him, such as banning him from office, have proven ineffective in eliminating the threat that he poses to the union. The district court's findings of fact support the conclusion that any contact between Sciarra and the membership of Local 560 runs the risk of returning the local to the control of the Genovese Family. Given Sciarra's sophistication, any less restrictive injunction would likely not be successful. Hence, the injunction issued by the district court, although sweeping in the limitations it imposes on Sciarra, does not violate the membership of Local 560's rights to association. Instead, the absolute ban on Sciarra's attending rallies and attempting to influence the local's affairs is necessary to ensure that he does not, through overt or covert means, allow corruption to infiltrate Local 560 again.

■ The injunction also places limits on Sciarra's ability to visit Local 560's union hall. That specific restriction is a means of effectuating the injunction's general prohibition against Sciarra influencing the union's affairs, and, consequently, we hold that it is also constitutionally permissible.

In sum, we hold that the injunction is narrowly tailored to further the compelling governmental interest in eradicating organized crime and corruption from labor unions and hence is constitutionally permissible.

## VII. LOCAL 560'S OBJECTIONS TO THE INJUNCTION BASED ON LMRDA

Local 560 argues that the injunction infringes rights guaranteed under the Labor–Management Reporting and Disclosure Act, 29 U.S.C.A. §§ 401 to 531 (West, 1985 and 1992 Supp). Specifically, the local claims that the injunction contravenes its members' rights under 29 U.S.C.A. §§ 411(a)(1) and (2) by interfering with the rights of members to run for office, by impermissibly restricting the choices of union members in elections, and by restricting the rights of members to assemble with Sciarra. We consider the alleged violations of sections 411(a)(1) and 411(a)(2) separately.

### A. *Section 411(a)(1)*

Section 411(a)(1) provides in relevant part:

> Every member of a labor organization shall have equal rights and privileges within such organization to ... attend membership meetings and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

Taken on its face, Section 411(a) is plainly contravened by the injunction because the injunction prohibits Sciarra from attending and participating in meetings. There are, however, circumstances that justify limitation of these statutory rights, most obviously the exception for "reasonable" rules and regulations imposed by the union.

■ We need not decide whether these circumstances justify restrictions, however, because we do not believe that the membership of Local 560 as a whole has standing to assert a claim under section 411(a)(1) on behalf of Sciarra. Unlike section 411(a)(2), section 411(a)(1) is, as is plain from its face, a guarantee of rights to *individual* members and not to the organization or members as a whole. Nothing in 411(a)(1) of the LMRDA provides a union with the right to object to the deprivation of one of its members' LMRDA rights, particularly when that individual is a party to the litigation and fully capable of raising the claim. The rights of the other union members under section 411(a)(1) simply are not at stake.

Further, while Sciarra could plausibly argue that his 411(a)(1) rights may be violated by the injunction, he does not make that argument. Sciarra's failure to raise any objections under section 411(a)(1) and Local 560's inability to do so are fatal to the claim.

### B. *Section 411(a)(2)*

■ Section 411(a)(2) provides in part that "[e]very member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions." Local 560 claims that its members' right to assemble freely with other members has been infringed by the injunction because they cannot freely meet with Sciarra to discuss union matters. The union does have standing to make this claim for it is clear that the injunction implicates the section 411(a)(2) right of Local 560 members to assemble. The question for our consideration is whether such a limitation is justified.

■ Having concluded that the injunction presents no First Amendment problem, we have little difficulty in finding that the injunction does not violate section 411(a)(2) either. We reach that conclusion for two reasons. First, section 411(a)(2), although modelled on the First Amendment, does not provide as extensive protection as that pro-

vided by the First Amendment. Indeed, the Supreme Court has noted that speech restrictions are valid under the LMRDA "so long as they are reasonable; they need not pass the stringent tests applied in the First Amendment context." See *United Steelworkers of America v. Sadlowski*, 457 U.S. 102, 110, 102 S.Ct. 2339, 2345, 72 L.Ed.2d 707 (1982). Having determined that the injunction satisfies the strict First Amendment requirement of demonstrating a compelling governmental interest, its restrictions are *a fortiori* reasonable under the LMRDA.

Second, the Supreme Court has implicitly rejected the argument that Local 560 now raises with regard to LMRDA rights. In *Brown v. Hotel & Restaurant Employees and Bartenders, Local 54*, 468 U.S. 491, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984), the Court considered whether federal labor law pre-empted a New Jersey statute that forbade unions representing workers employed in the casino industry from receiving dues from members who were "career offenders" or whose presence was inimical to keeping organized crime out of the casino industry. Under the New Jersey statute, members of Local 54's executive board were disqualified from their roles because of such prior convictions. The union brought suit, arguing that the state statute regulating who might be chosen as an officer of the local was pre-empted by federal labor law, which guaranteed to union members the right to associate freely and the right to have officers of their own choosing.

In upholding New Jersey's restrictions on members' associational rights, the Supreme Court noted that "Congress has unmistakably indicated that the right of employees to select the officers of their bargaining representatives is not absolute and necessarily admits of some exception." Id. at 504, 104 S.Ct. at 3187. The court further noted that governmental restrictions of section 411(a)(2) rights due to organized crime are favored because "Congress was prompted to [enact the LMRDA] in large part because the governmental machinery was not effective in policing specific abuses at the local level and in stamping out crime

and corruption in unions." Id. at 506, 104 S.Ct. at 3188.

We believe that in the present situation, where the government has demonstrated the presence of a compelling interest in eradicating corruption from organized labor, the limitations are at least as justified as the restrictions imposed by the state in *Brown*. The federal government, like state governments, has a valid interest in restricting rights when the compelling interest of eliminating corruption is at stake. We hold that the injunction did not violate Local 560's members statutory rights.

## VIII. VALIDITY OF THE INJUNCTION UNDER RICO

Finally, Local 560 claims that the injunction was not valid under RICO. Congress enacted section 1964(a) of RICO so that, in cases where there has been a RICO violation, courts are free to take steps necessary to restrain ongoing or future violations:

> The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of interests in any enterprise; *imposing reasonable restrictions* on the future activities or investments of any person, including, but not limited to prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, *making due provision for the rights of innocent third persons*.

18 U.S.C.A. § 1964(a) (emphasis added). Relying on the language of the statute, Local 560 argues that the injunction does not make provision for the rights of innocent third parties and that the injunction is unreasonable. We hold that neither claim has merit.

First, the injunction makes appropriate provision for the rights of innocent third parties. As we have stated in our discussion of the sufficiency of the evidence, the absolute removal of Sciarra from Local 560 is necessary to remove the

**348**

influence of organized crime from the local. The only detriment to members of Local 560 is that they will be unable to associate with Sciarra, a relatively slight limitation, given that the benefit is a union more likely to be corruption-free. Our prior holdings in this same litigation bolster our conclusion. We have previously upheld injunctions removing individuals from Local 560 (and restricting associational rights) as permissible under RICO upon a finding that the injunction would help eliminate corruption. See *Local 560*, 780 F.2d 267, 296 n. 39 (upholding issuance of 1964(a) injunction where injunction "protect[ed] rather than forfeit[ed] the members' rights"); *United States v. Local 30, United Slate, Tile, and Composition Roofers, Damp and Waterproof Workers Association*, 871 F.2d 401, 407 (3d Cir.1989). On the record here, there is ample evidence to demonstrate that the RICO violations that justified those initial injunctions are continuing, and hence the issuance of the injunction in this case is permissible under RICO.

██ Local 560 also argues that the injunction is "unreasonable," as that term is used in section 1964(a). The crux of the local's argument is that an injunction is unreasonable under section 1964(a) if it abridges First Amendment and LMRDA rights. Having determined that the injunction does not abridge those rights, we also conclude that it is reasonable within the meaning of section 1964(a).

## IX. CONCLUSION

For the foregoing reasons, the order of the district court will be affirmed.